GEORGE WASHINGTON, (Negro) plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. Where a defendant is indicted and put upon his trial for the crime of murder, it is the duty of the Court to give in charge to the jury the law defining that offense; and if the evidence shall authorize it, but not otherwise, also to give in charge to the jury, the law defining the inferior grades of homicide less than murder, as declared by the Code of this State.

2. When a defendant is indicted as the actor or *absolute* perpetrator of the crime of murder under the Code, it is error in the Court to charge the jury, that they can find him guilty as principal in the second degree; but on the trial of a defendant so indicted, if the evidence shall authorize it, the Court may charge the jury, that if they believe from the evidence that it was the intention of the parties engaged in a common difficulty, to do an *unlawful* act, and the defendant in the prosecution of that intention, committed the homicide upon the deceased; or if they should believe from the evidence, that the homicide was committed upon the deceased by either of the parties engaged in the prosecution of that common intention, then they might find him guilty.

3. When a verdict is found against a defendant, of "guilty of murder as

Washington *vs.* The State of Georgia.

principal in the second degree," when he is indicted as the absolute actor and perpetrator of the crime, the verdict does not speak the *truth* as to the issue formed upon the indictment, and is error.

Murder. Motion for New Trial. Tried before and decided by Judge VASON. Dougherty Superior Court. May (Special) Term, 1867.

The bill of indictment, in proper form, charged the defendant, alone and as the actual perpetrator, with the murder of Henry Holmes, with a knife, on the 13th April, 1867.

The evidence produced at the trial, *pro* and *con.*, was as follows:

#### EVIDENCE FOR THE STATE.

EDMUND WOOLDRIDGE, (colored) swore: On Saturday night, when witness came from work at the brick-yard, he came by Henderson's house; this was about three weeks ago, and about supper time. At that time Henderson and Proctor came out of Roxy Hatcher's House, and Henderson said it was all right; but Proctor said it was not all right with him, and then Proctor struck him. Henry Holmes (deceased) was right ahead of them, and hallooed "Help! Help!" and prisoner ran up to deceased and struck at him, and kicked at him, and said to deceased, "What have you got to do with it, God damn you!" Witness went to deceased immediately as he was hallooing, and found him badly cut in his bowels, of which wound he afterwards died; and deceased stated to witness, that it was that Baltimore negro that cut him. Prisoner, Proctor, Henderson and witness were the only persons present at that time. Witness did not see the knife in prisoner's hand—supposed at the time that he had struck him only.

#### CROSS-EXAMINATION.

It was a moonlight night. There was no person present when prisoner struck deceased, but witness, Proctor, Henderson and prisoner. Prisoner had on a long-tailed dark overcoat and white hat; thinks the coat and hat he now has on

are the same. Witness is certain the hat was white. There were no women present. John Brewer and Robert Rideout were not there. The house of Roxy Hatcher was on the north side of the street, and witness was on the south side of the street with the whole middle of the street between him and the parties fighting; he saw Roxy Hatcher in the door holding a candle. Does not know where prisoner came from, but saw him immediately after the fight; first saw him right where the parties were fighting, with his right elbow resting on the fence. Witness had seen prisoner several times before that, but had no acquaintance with him; he knew that was George Washington, the prisoner, that night,—knew him by his coat and hat. Witness was right by the parties when they were fighting; deceased was passing home on the same side of the street with the parties fighting, and deceased was about ten feet from the parties fighting. Deceased cried "Help! Help!!"

The street is not as wide as this court-room; it is abou ten or fifteen feet wide. Witness was not under the influence of liquor, had not drunk a drop. Witness is certain it was prisoner that he saw; knew him by his coat and hat; don't know that he would have known prisoner but for his coat and hat.

### REBUTTAL.

Prisoner had on a big, long, black overcoat and white hat. Prisoner and Proctor ran off after the fight. Prisoner knocked deceased down, and old man Romeo was knocked down immediately; then prisoner and Proctor ran off. Prisoner was arrested next day, and witness saw him, and swears positively that he is the man that struck deceased.

Dr. William L. Davis, sworn, said: he attended deceased between 8 and 9 o'clock, P. M., Saturday night of the speaking, the 13th April last, and found deceased in a collapsed condition; his bowels were cut with some sharp instrument; the intestines were out; one of them was cut about three inches. This wound produced his death; he lived about four or five days.

Washington *vs.* The State of Georgia.

GEORGIA ANN HENDERSON, sworn, said: she then lived across the street from where the fight took place; she is the wife of Henderson; he had gone across the street to Roxy Hatcher's to pay her some money. From witness to where the fight took place, it was sixty feet. When she heard the hallooing, she went out and met prisoner, Proctor and Rideout; they came to her house and got their things. Prisoner had on a dove-colored coat, and a hat such as he has on now. Robert Rideout had on a long dark overcoat and black hat. Proctor had on a blue knit coat and a velvet cap. This was the same night deceased was wounded.

CROSS-EXAMINATION.

Witness met these three right at the place where the fuss was; she soon after saw the others of the Baltimore crowd; saw nothing of the fight herself. The Baltimore crowd, including prisoner, boarded at witness's house at the time of the fight. She thinks prisoner had on a white hat, and knows he had it on in the afternoon before. About one hour before the difficulty, prisoner had on a short, dove-colored coat and white hat; and when she met him going away from the difficulty, he had on the same dress. Witness does not know whether it was a dark or moonlight night.

IDA HOLLY, sworn, said: she is the daughter of old man Romeo; lives near the place of the fight; went out with her father to stop the fight. Proctor had Henderson down, beating him; her father called to them to stop their fighting. Prisoner said, "God damn you, what business is it of yours?" and knocked her father down. Proctor, Henderson, prisoner, her father and herself were the only persons she saw. Prisoner had on a long, dark overcoat and a white hat, such as he has on now.

JAMES KEMP, Sheriff, sworn, said: he arrested prisoner next morning early, together with four other negroes, called the Baltimore crowd of negroes, found at John Flint's place, where they were employed, and brought them to Albany. The witness, Ed. Wooldridge, selected prisoner from the crowd, as being the man who cut deceased.

15

### EVIDENCE FOR PRISONER.

JOHN W. PROCTOR, sworn, said: he was fighting with Henderson, had knocked him down several times, and prisoner said, " West, that will do, don't do it." The fighting then ceased. There were present at the time of the fighting, prisoner, witness, Henderson, John Brewer and Robert Rideout. As they passed across the street towards Henderson's house, they met Henderson's wife about half way, and when witness reached Henderson's house, Rideout came up to him and said he had cut a man. Witness advised him to go out to Mr. Flint's farm. He saw the knife with blood upon it, next morning at Mr. Flint's house, which Rideout said was the one he cut the man with. Prisoner had on that night, at the time of the fight, a dove-colored sack-coat and the same hat he has on now. Rideout had on the coat which prisoner has on now. Prisoner has on the same sack-coat now that he had on that night, and the overcoat that he has on now, is the one Rideout had on, the night of the difficulty. Prisoner remained near witness during the whole of the fight, and went with him on to the house of Henderson. Witness did not see deceased before the cutting. Witness did not see prisoner do any cutting, and was not far enough for prisoner to do any cutting without witness seeing it. It was ten or fifteen paces from where witness was fighting, to where deceased fell. Witness saw nothing of deceased at the time of the fighting; heard no noise or complaint made by deceased while the fighting was going on.

### CROSS-EXAMINED.

Witness was living at Henderson's house at the time of this difficulty, and had been boarding at Henderson's house for three or four days. Witness did not hear deceased hallooing. Prisoner could not have cut deceased without witness seeing it. Witness was in his shirt sleeves, had on a hickory shirt. Prisoner was standing all the time by witness. Deceased was lying ten or fifteen paces west of where the fight

Washington *vs.* The State of Georgia.

was going on. Witness did not see the deceased, nor hear anything of him until after the fight. Romeo did not come up and command the peace; prisoner did not knock Romeo down. Ida, Romeo's daughter, was not there at the time of the fight; there was no woman there at the time of the fight. A good many persons came up afterwards, as witness was leaving.

JOHN BREWER, sworn, said: he was present and saw the fight between Proctor and Henderson; was close to the parties fighting. Deceased came up during the fight and said, "Help! don't beat that man any more." Then witness saw Rideout draw back his hand like he was going to strike deceased; and in a few seconds he heard deceased say he was cut. Rideout had a knife in his hand; witness did not see Rideout cut him. They all then went to Henderson's house. Witness heard Rideout say as they were going to Henderson's house, "Boys, I've cut a man, and what must I do?" They answered him, to go out to the farm. Witness saw the knife that Rideout said he cut the deceased with, and it had blood on it. Prisoner had on a short sack-coat, light-colored. Rideout had on black pants, black, big overcoat, and black hat. Prisoner was ten or twelve steps from deceased when he cried out "Help!" Prisoner was not nearer than five or six steps to deceased at any time.

Prisoner knocked down one old man; don't know who he was; an old man was knocked down, close by where the fighting took place.

CROSS-EXAMINED.

Witness was about ten feet from the fight; Proctor did not get Henderson down; prisoner knocked that old man down; the old man did not come nearer than ten feet.

Prisoner had on the same pants he now has on, and a little light-colored coat. After Rideout raised his hand, as soon after as it would take to speak a word or two, witness heard deceased say he was cut; deceased was ten or twelve steps from where the fighting was going on when he said he was

cut; deceased and Rideout were close enough for Rideout to have cut him.

ROBERT H. RIDEOUT sworn, said: he was present at the fight above mentioned; knows prisoner did not cut deceased; prisoner had on a sack dove-colored coat; witness had on a long black over-coat.

### CROSS-EXAMINED.

Witness was about the factory on the river when he first heard the fuss, and then ran, in a pretty quick run, to where the fighting was; prisoner, Stephen Brown, Charles Randolph, and John Brewer were with witness when they heard the fuss, and we all got there about the same time; witness was about ten or twelve feet from the parties while fighting; he saw one man fall that was knocked that night, but he does not know who it was.

The old man that was cut was west of where the fighting was going on; one old man came up there and tried to make peace; witness pulled Proctor away from Henderson; deceased was cut during the time of the fight; witness had on prisoner's coat that night, the one prisoner has on now; prisoner had on the white hat he now has.

The fight lasted twenty or thirty minutes after witness got there; witness saw Henderson fall twice after witness got there; witness had the coat on at the time of the fight.

### EVIDENCE OF THE STATE IN REBUTTAL.

ROMEO BRISBANE sworn, said: he was not present at the commencement of a difficulty between Proctor and Henderson; he came up while they were fighting, and said, "Boys, you must not do that way," and prisoner then knocked witness down; prisoner had on just such a coat as he now has on; witness saw no one except Proctor, Henderson, and George Washington (prisoner), just behind Proctor.

Nobody else was present, but others were off a little way; witness did not see deceased at that time.

Washington *vs.* The State of Georgia.

### CROSS-EXAMINED.

Prisoner was as near as three steps; prisoner had on a long dark-colored coat, but witness could not tell the color.

### REBUTTAL.

Witness saw prisoner in the face that night, and knows it was he; knows he was the man that knocked him (witness) down; witness met Edmund Wooldridge going from the fight as witness went up; it is about forty feet from witness' house to where the fight was.

ARCHER HENDERSON sworn, said: the fight was the same day of the speaking or meeting; prisoner was at witness' house about supper time, and had on the same coat he now has on; witness did not see prisoner at the time Proctor struck him; prisoner was at his house fifteen minutes before the fight.

### CROSS-EXAMINED.

Witness left the crowd of Baltimore boys at his house; they fought about four minutes.

### RE-EXAMINED.

Proctor hit witness three times to his recollection, and kicked him.

NELSON TIFT sworn, said: From his knowledge of the character of Edmund Wooldridge and Romeo Brisbane, they ought to be believed by a jury; from his knowledge of these two boys, he would believe them as quick as any colored boys he ever saw.

PATSEY SLAUGHTER sworn, said: She heard deceased halloo that he was a dead man, and ran up to him. She saw prisoner, and a yellow man that was with him, pass by her about ten feet off, going to Henderson's house. Prisoner, she thinks, is the man.

VINEY FERGUSON sworn, said: She was with deceased up to the time of his death. Deceased asked if Mas'r Asa Tift

had come. Mr. Asa Tift soon appeared, and deceased remarked to him, in his last words, that "George Washington (meaning the prisoner), killed him for just two words, killed him for nothing."

Here the evidence closed, and after argument had, the Court charged the jury as follows :

1st. You ought to give such construction to the statements of all the witnesses in this case as shall reconcile them and prevent a conflict, if possible. Each one is to be supposed to have spoken truly, but if you cannot avoid a conflict, then you must determine the truth.

2d. Those witnesses who show that they have the best means to be well informed on the matters about which they have testified, (all other things being equal,) are to be preferred to those who have not such good means for accurate information.

3d. If, after a review of all the evidence in this case, you have resting on your minds a reasonable doubt as to the guilt of the defendant, he is entitled to the benefit of such doubt, and you ought in that event to acquit him.

4th. The State's counsel is not bound by the statements or evidence of one of the witnesses introduced for the prosecution ; such witness' statements may be attacked by the State if they are not sustained by the evidence of other witnesses ; the State is not bound to adopt the evidence of such witness.

5th. As the counsel both for the prosecution and State have here conceded that the perpetrator of this act is guilty of murder, I shall not charge you on the law relative to the different grades of homicide. If you are satisfied that the fatal stab was inflicted on the deceased, without any considerable provocation on his part, the law implies malice, and it is murder.

6th. The defence relied upon in this case, is that the defendant is not the perpetrator of the act, and you must be satisfied beyond a reasonable doubt that he was the perpetrator, or you cannot find him guilty of murder.

7th. The Solicitor General contends that, if he is not the actual perpetrator, yet he is chargeable for the act as princi-

Washington *vs.* The State of Georgia.

pal in the second degree, under the facts of this case.   Upon that subject I charge you, that, if defendant and others at the time of the killing were voluntarily engaged, with a common purpose and intent to fight and whip the man Henderson, then all who took part in it directly, or aided and abetted in it by keeping off (by threats, or blows, or otherwise), persons who desired to stop the fight and restore peace, are guilty of a riot; and if this homicide was committed upon the deceased by any one of the parties thus engaged, because he interfered to stop the fight, then each one thus engaged is responsible; and if the killing was without provocation, then each one is guilty—the man who struck the fatal blow is guilty as principal, and all the others thus engaged in the riot are guilty as principals in the second degree; and if you are satisfied from the proof that the defendant was thus engaged (beyond a reasonable doubt), then, though he may not be the party who used the knife, yet he is guilty as principal in the second degree, and you ought so to find him.

8th.   Counsel for the prisoner desire that I charge you that the defendant cannot be found guilty, unless the proof shows that he had the intent to commit this crime.   This I cannot charge you on this branch of the case; for if the defendant was engaged in a riot at the time of the killing, he as well as all others engaged with him, are liable for all acts committed by any one of the parties thereto; and it matters not whether defendant intended to commit this act or not, he is responsible if he was thus engaged, and the killing occurred during the riot, and was the act of one of the parties thereto."

Some time after the jury had retired to deliberate on their verdict, "the Court being satisfied that the jury did not agree as to what was the charge of the Court, at their request, recalled them and read the written charge" aforesaid, but refused to read them Section 3793 of the new Code, as to *impeaching* one's own witness, though requested by defendant's attorney to do so.

The jury again retired and returned the following verdict: "We, the jury, find the prisoner guilty as principal, of murder in the second degree.      I. M. CUTLIFF, Foreman."

During the term, defendant's attorney moved for a new trial upon the grounds that the Court erred—

1st, In charging the 4th item of said charge.

2d, In charging upon the proposition of the Solicitor General, as appears in the 7th item of said charge.

3d, "In making the above charges, because they are not authorized by the facts in this case or no other case; and in making said charges, the Court misled the jury as to the law and the effect of their verdict, as they would not have found a verdict for murder in the second degree, if they had known that the punishment was death. The Court should have read the statute to the jury." (*Note by the Judge:* "The Court was not requested to read to the jury, the law defining the punishment of principals in the second degree.")

4th, "In charging what never was law, and in refusing to charge that crime can only be committed in Georgia, where there is a joint act and intent."

5th, "In recalling the jury without the consent of counsel, and reading his charge to them after they had been out in deliberation on the case for twelve hours; and in refusing to read paragraph 3793 of the Code, as requested by counsel;" and last, because the verdict was "contrary to law and without law, and contrary to evidence and the weight evidence, and without evidence."

The Court, after argument had, overruled said motion, refused a new trial, and sentenced the defendant to be hung.

This refusal of a new trial upon the grounds in said motion stated, is assigned as error.

H. Morgan and J. A. Davis, for plaintiff in error.

N. A. Smith, represented by N. J. Hammond, for the State.

WARNER, C. J.

The defendant was indicted and tried as the actual perpetrator of the crime of murder, which is the highest grade of homicide known to the law.

1. It is the duty of the Court, on the trial of a defendant for a violation of a public law, to give in charge to the jury, the law defining the offense. In this case the presiding Judge stated, " that he would not charge the jury as to the law relative to the different grades of homicide, because the counsel both for the *prosecution* and *State,* have here conceded that the perpetrator of this act is guilty of murder." The Court intended to say, we presume, that the counsel both for the *State* and the *prisoner,* have here conceded that the perpetrator of this act is guilty of murder. Still, that concession, if made, will not absolve the Court from the performance of its duty, where the life of the prisoner is involved, in giving to the jury the law applicable to the offense with which he is charged. In our judgment, when a defendant is charged with the crime of murder, it is the duty of the Court to give in charge to the jury, the law defining *that offense,* and if the evidence upon the trial will authorize it, but not otherwise, also to give in charge to the jury, the law defining the several grades of homicide as declared by the Code, so far as the evidence will authorize and is applicable to such inferior grades of homicide. But if there is *no evidence* which would authorize the jury to find a verdict for any grade of homicide of less degree than that of murder, then such charge ought not to be given. It is always the duty of the Court to charge the jury, the law applicable to the facts *proved* on the trial, and not upon an assumed state of facts *not proved* on the trial.

2. The next ground of error is, that the Court charged the jury that they could find the defendant guilty as principal in the second degree, upon the evidence in this record, when he was charged as the actual perpetrator of the crime, in the indictment. "A principal in the first degree is he or she that is the actor or *absolute* perpetrator of the crime. A principal

in the second degree, is he or she who is present aiding and abetting the act to be done; which presence need not always be an actual, immediate standing-by, within sight or hearing of the act, but there may be also a constructive presence, as when one commits a robbery, murder or other crime, and another keeps watch or guard at a convenient distance." Code, section 4204. Can a defendant, under our Code, who is charged as the *absolute* perpetrator of the crime, be found guilty as a principal in the second degree? We think not, for the obvious reason that the accusation does not *notify* him that he will be held responsible for such acts as will make him a principal in the second degree, and therefore he is taken by *surprise* at the trial. The accusation in the indictment only notifies him that he was to be held responsible as the *absolute perpetrator of the crime,* and at the trial he was prepared to meet *that charge;* but if under that charge, he can be found guilty as principal in the second degree, by proof of such facts as will make him such under the definition of the Code, then he has had *no notice* that he will be required to meet such evidence, or be prepared to rebut or explain it. But it is said the punishment is the same in both cases. In reply to that suggestion it may be said, that the punishment for murder and the willful, malicious burning of a house in a town or city, is the same; but the allegation in the indictment for each offence, would not be the same, although the punishment may be. In our judgment, the Code in defining who shall be a principal in the first degree, and who shall be a principal in the second degree, clearly contemplates that the party shall be indicted and charged with that degree of the offence for which the State seeks to convict him. If there is any doubt as to what the evidence may be on the trial, the safer course would be for the prosecuting officer to have two counts in his indictment, charging the defendant as principal in the first degree in one count, and as principal in the second degree in the other, as was done in Commonwealth vs. Knapp, 10th Pickering's Rep., 478. The case of Hill vs. the State, (28th Ga. Rep., 604,) has been cited in the argument. In that case, the defendant was indicted as the *principal perpe-*

*trator of the crime,* and the Court held that all the parties engaged in the transaction were principals, the stroke of one of the parties, being in law the stroke of the other. What were the particular facts in that case, the report does not show. The principle asserted in that case, we affirm as an *abstract principle of law,* without any knowledge of the facts to which it was applied. If, however, the facts in that case were as assumed by Mr. Justice Stephens in his dissenting opinion, we concur with him in holding, " that under an indictment against one as principal in the first degree, there can be no conviction of him as principal in the second degree." Whether the evidence in that case was sufficient to make Hill a principal in the first degree, as he was charged in the indictment, or whether it only went to show that he was a principal in the second degree, we do not know, as there is no report of the evidence. The defendant in this case was indicted as the principal perpetrator of the crime, and in view of the facts disclosed by the evidence, the Court below should have instructed the jury, that if they believed from the evidence that it was the intention of the parties engaged in the difficulty between Proctor and Henderson to do an *unlawful* act, and the defendant in the prosecution of that intention, committed the homicide upon the deceased; or if they should believe from the evidence that the homicide was committed upon the deceased by either of the parties engaged in the prosecution of that common intention, then the jury might find him guilty— that is to say, guilty as principal perpetrator of the crime as charged in the indictment. That part of the charge of the Court below, instructing the jury that they could find the defendant guilty as principal in the *second degree,* "although not the party who used the knife," was error.

3. The verdict in this case finds the defendant guilty of murder as principal in the *second degree,* which is contrary to the allegation in the indictment, which charges him as the actual perpetrator of the crime. The verdict, therefore, does not speak the *truth* as to the issue formed upon the indictment, and is error.

Let the judgment of the Court below be reversed.