## STATE v. THOMAS COVINGTON.

### *Indictment for Murder—Degrees—Evidence.*

1. On a trial of one charged with murder, the only evidence of the circumstances under which the homicide was committed, was contained in the prisoner's alleged confession that he entered the store of the deceased to commit larceny, deceased got between him and the door, and "I watched my chance and jumped on the old man and wrenched his pistol and the old man halloed 'murder!' Then I shot him through the body. The old man said: 'You have got me.' I aimed to shoot him and this must have been when I shot him in the neck. And I shot him again ;" *Held*, that it was proper to instruct the jury that in no view of the evidence was the defendant guilty of murder in the second degree or manslaughter, and they should either acquit or find the defendant guilty of murder in the first degree, the second and third shots being the fatal ones, and the confession showing that they were fired with deliberation and premeditation.

2. Inasmuch as the Act of 1893 (Ch. 85, Acts 1893), dividing the offence of murder into two degrees, and making homicide committed while perpetrating or attempting to perpetrate a felony, murder in the first degree, provides that nothing contained in the Act shall require any alteration or modification of the existing form of indictment for murder, it is not necessary that an indictment for murder committed in the attempt to perpetrate larceny, should contain a specific allegation of the attempted larceny such allegation not having been necessary in indictments prior to the said Act of 1893.

INDICTMENT for murder, tried before *Timberlake, J.*, and a jury, at Spring Term, 1895, of CATAWBA Superior Court. It appeared from the evidence that the deceased was part owner, as a stockholder and general superintendent, of Long Island Cotton Mills, and that he lived with his family about 250 yards from the mill, and that the prisoner was an employee at the mill, being superintendent of the spinning room. It further appears that the deceased had a stock of merchandise in a storehouse about 100 feet from mill, and that for more than a year some one had been occasionally entering said store by means of false keys, and stealing some quantity of goods, and that, on night of homicide, deceased went to the store to sleep that he might catch the thief.

Miss Essie Brown testified: "I am daughter of James Brown, deceased. Father is dead. Lived at the time of his death one mile from Monbo P. O., in this county. Saw him last alive Wednesday night, September 26, 1894, about 8 o'clock, p. m. He was in dining room at home. House from store is distant 100 feet. I next saw him Thursday morning, in store, a few minutes after 6 o'clock. It was my duty to be at the store at 6 to attend to the duties of store. Was often in store with father. Factory is near the store. Hands change at 6 a. m. Notice given by bell. I was at that time in the house, getting ready to go

to the store. When I got to the store, and up the steps, put key into the door to unlock it. It came open, and I found papa lying on the floor as if asleep. Saw a little blood on his hat. His body was 1½ feet from the door. I opened right door, and in opening it came near his head. Door was unlocked. Body was lying straight out, head towards the door. Whole face was on floor. Left side somewhat turned down. Blood was somewhere on the cheek. Noticed no other injury on face. I did not stay there very long. I tried to hollow, but couldn't. After Mr. Pope started to store, I left. I said nothing to any one. When I reached factory, I saw Elam Josey, who was on lower floor. Machine which sits near door is called 'speeder.' Store could be seen from speeder. He was all I saw there. Afterward saw George, who came to me. Next, Mr. Covington, prisoner's father, came. We went up to the house. Prisoner was upstairs, I think. Didn't see him. Prisoner had been working there several years. His part was upstairs. I did not see prisoner till that p. m. Osborne was not at home. He came about 9 a. m. Was next in store when I went down with Osborne, between 9 and 10, a. m. There was a roll of tin that I kept door open with. It was roofing tin. Roll was about 2 feet high, 1 foot thick. When on end it was steady. I noticed it Wednesday, for I kept door open with it. Box was standing up back of counter, about 7 feet from my father's body. Didn't notice anything wrong with tin till I went down with Osborne, when it was on other side of counter. Counters are eight feet apart. Body was near one side. Tin had blood on it, and was on opposite side from where I noticed it the night before. It had much blood on it. Body was perfectly straight. Box was turned upside down. Didn't notice any stains on it. Tin cup was on counter, and had mud in it. Tin was on the

left of father.   Tin cup had clean water in it the ·day before.   Marks of blood near matches.   They were kept in small dishpan.   This was overturned next morning. Three or four little stains of blood about matches.   Were similar to finger prints.   They were not there the evening before.   Tin lamp was near father's head, and was out. Saw lamp night before.   It had oil in it then.   Left it on counter, on left side, on front part of counter, about opposite the matches.   Didn't notice whether oil was exhausted.   Father had three scratches . over one eye. Had a black place on forehead, near center.   Sunken place about as large as a nickel.   He slept on right hand side of counter, going in back of it.   He had been sleeping there since Sunday night previous, by reason of finding evidence of some one going in store.   He had no bed, but some quilts.   Had to cross over counter to get to sleeping place.   Door was just pushed to.   There was little blood about door latch, about one or two inches.   Something like print of thumb.   His hat was back of counter.   So was key and handkerchief.   Knife was in his hat, also. Store key was in his hat."   A key is shown her which she says "is the key that was in papa's hat.   Body remained at store till 5 p. m.   It was taken to the house.   Dr. Wilson was there.   Discovered a shot in his breast by blood stains on his clothes.   I went to the store when body had been turned.   He had been shot in neck, and on left side of his head, back of ears.   Didn't see Covington till that p. m., and then in yard at home.   Factory was stopped at once after I went down.   Defendant was out in yard talking to some men.   Saw nothing else of him that day. Many persons there.   He was buried Friday, before dinner. Body was taken about one mile..   Didn't see defendant at burial."   Cross-examinaton :   "Store near house.   Elam Josey lives nearest the store.   Just back of it.   Closer than

our house. Not further than front door of court-house.
Father had a wife, myself, two brothers, and two sisters.
Had not slept in that part of store before Sunday night.
The pistol was father's. It was 6:10 when I went to the
store. Think defendant's father helped to bring the body
to the house." Redirect: "Pa was lively, laughing and
talking at tea table."

The principal testimony relied upon by the State, in
addition to many corroborating circumstances testified to
by various witnesses, was that of Ellen Josey who testified
concerning an alleged confession by the prisoner. His
testimony was as follows:

"I am 23 years old. Have lived at Long Island 7 or 8
years. Am married. Live 200 or 300 yards from the fac-
tory. Have known Tom Covington 12 or 13 years. He
lived at cotton mill, at death of deceased, 400 or 500 yards
from the store. Prisoner lived east from the store. Land
sorter rolling and hilly, and branch between prisoner's
house and store. I was in cotton mills when I first heard
of the death of Mr. Brown. I got to mills at 5:45, a. m.
I run speeder, which is located in lower part of the house.
House is two stories. Speeder is 6 or 8 feet from entrance.
Prisoner is second hand in spinning room. I am a day
hand. I first saw the prisoner some time before 6,—10 or
15 minutes. He got there first. Was down stairs when I
first saw him. Had heard nothing, till prisoner came to
me, about Brown's death. He came to me, and said he
'killed old man Jim last'—some one then stepped up, and
he started to the oil room to get oil. It is in the lower
story. Says, 'I'll tell you more about it later on.' He
looked at me again, and motioned his head to call me to
him. I went to him. He pushed door open, and I fol-
lowed on behind him. He said, 'I certainly killed Mr.
Brown last night.' He put his hand in his pocket and pulled

STATE *v.* COVINGTON.

out a key (key is here shown witness which he says is
the key), and handed it to me.  He said, 'don't throw
it in the river.'  He then went off upstairs, and
I saw him no more.  I stuck key in my pocket
and went on to my work.  I saw Miss Essie come to the
store, put key in the door, and it opened.  She stopped,
and was looking in.  She turned around and came to the
mills, and said to me, 'Where is George?'  I went and
motioned to George.  He came and said, 'What is the
matter?'  She said, 'Pa is dead.'  Lee Robins came up.
Me, George and Miss Essie went to the store.  George gave
orders for the mills to shut down.  He was at the store
when he said, 'Shut down.'  Me and Adams' boy went
back together through into the lapper room.  I went out
and hid the key after I came from the store.  I hid key in
lapper house.  Stuck it in the ground with my fingers, and
put my heel on it.  Nothing more was said about murder
till next day at grave.  I was at dwelling that day.  That
morning Covington was in the store with his father.  I
looked in, and some one spoke about coroner, and I went.
Had communication with prisoner Friday in woods at
graveyard.  I was standing near grave and he came to me
and said, 'Let's take a walk,' and said, 'I'll tell you all
about it.'  We got off the road a piece and he began.  Said
he got up that morning, slipped out from his wife, and
came across the branch to get him a load of wood, and he
thought he would go in store, which he did, when he got
in far enough for Mr. Brown to get between him and the
door.  When he did, Mr. Brown said, 'Is that you Pope?'
'I made no answer.  Says : "Is that you, Tom?  You had
better speak, I have a revolver on you." '  Said he watched
his chance, jumped on the old man, wrenched his pistol
from his hand.  'Then the old man hollowed, "Murder."
Then I shot him through the body.  Old man says, "You

have got me." I aimed to shoot him, and this must have been when I shot him in the neck. He then made a turn, and I shot him again, and he fell. In the rounds I lost my hat, and knew it would not do to let my hat stay there. I hunted around, and got a match, and struck it. Found my hat, got out, and shut the door. Discovered blood on my hands. I washed blood off at the branch, and went to the house, and made a fire, and called my wife up. As I came to my work from home, I tramped out all my tracks I made coming from store.' Was at service at church. Prisoner was there. He never went in. Think talk was while corpse was in church. I saw Bridges, Joe Fisher, Andy Moore, and Ike. Prisoner came to me while I was standing close to grave. Think he came from down the road. Didn't say what he went in for. Have seen key before. Me and prisoner have been in store before. Prisoner came and got me to go with him. We went down and went in, but I saw nothing he got. We went in again and he got 65 cents, and gave me 30 cents, which I put in my pocket. He told me he took a right smart sack of shot, money, and shoes. He said shoes were too large for him, and he would let Henry have them." Shoes are shown him, which he thinks are same shoes. "He was in his own house when he showed me the shoes. He said they were 9, and he wore 7. Covington might be best man. Ike Stewart stepped up, and said, while coroner was examining witnesses, he didn't think one man could handle Brown. Some time after that prisoner said old man Brown was not the man people thought he was. Said he could handle him as he could Charlie Robbins. Mr. Deaver arrested me on account of some talk I had with Burris. Been in jail 4 months. Did not tell Miss Essie because prisoner told me he would kill me if I told it, and he had said before, if I ever told anything he would kill

STATE *v.* COVINGTON.

me. It was in 1893 we did our first stealing. I was brought to jail and put in cell. Next time I saw prisoner he was in jail. No one in jail but me, prisoner, and John Best. I was in a different cell, but same cage. While there he came, next morning, 18th or 19th, and squatted down at my door. I says to him, 'What are you going to do?' He says, 'I am going to prepare for a better world.' Said, 'I would own it, but am afraid they will come and get me before court.' Says, 'If you tell something on me at court, as you did at j. p. trial, I would be bound to own it.' Have seen him write. I know his writing." Letter marked 1 identified as prisoner's handwriting. "So is 2, except on back, which is mine (Josey's). So is side A of 3. So is 4, 5, 6, 7. 8, 9, 11, 12, 13, and 14 are prissoner's. 10 is mine. I was in jail when I first saw letters. He handed or sent them to me. I answered some notes he sent to me. He wrote me, in a note, he had torn my letters up. Had seen key before. He said he hammered out file in blacksmith shop, and him and me went on the island, and he worked on key. Worked on the little part of it with a file that day." Letters are now read. 9 and 10, upon objection, are withdrawn, and jury are told not to consider them in making up their verdict. "I was tried before Esq. Turner. Prisoner was in mills when tried. I was there. I testified before j. p. Was cross-examined by Covington (prisoner). He asked me, 'Didn't I holler and tell you some one had killed old man Jim.' I said, 'Didn't think he did.' Mr. Deaver, Bridges and his father, and j. p. were all there. He also said, 'Didn't you misunderstand me?' I said not." Cross-examination: "Tom Covington said he would kill me if I told anybody; this is the reason and the truth. Don't know whether I would have told if he had not threatened me. Suppose I would. He threatened after he told me these things, and

beforehand he had done so.   He told me, once before, if I
told it he would kill me.   Told me so before I went with
him.   I told him I would go with him in the store.   I did
not know that he would be arrested.   He had a heap of
friends.   He was a friend of mine, the reason I
did not tell it.   One reason was because I was
afraid ;   another, I wanted to screen him.   Have
sworn about this more than twice,—three or four
times.   Gave in evidence before coroner.   Think I was
sworn.   Didn't tell all before coroner.   I swore, before
coroner, I did not know who did it, and had no suspicion.
This was not the truth.   Admit I swore falsely once.   I
did it to save Tom.   Would swear to a lie any time to save
my friend, and, with threats against me, to save my own
life.   Swore to it to keep from being killed myself, and to
save Tom's life.   Would not swear to a lie to-day to save
Tom's life.   Have been accused of this murder myself.
Wasn't first man arrested.   Denied knowing anything
about it.   First told about it on my way to jail.   Told it
to Mr. Bridges, Mr. Deaver and Crawford.   Was walking
along the road.   Didn't curse or threaten me.   I told Mrs.
Frye it looked hard to be in here for nothing.   She said,
'Why didn't you tell on him ?'   I said they had me arrested,
and I was not the man who did it, and Tom had told me.
Did not tell John Best I swore to it to save my life.   Told
him I told it because I was not the man that did it.   Did
not tell him I told the lie to save myself.   Don't know
who wrote first one.   Don't remember whether Mr. Yount
suggested to me to write to Tom.   Soon after I got here,
he gave me paper, and told me to write down the whole
affair.   I was at home the night the murder was commit-
ted.   Live 75 or 100 feet from store.   Wife, sister and
brother-in-law were at home with me.   I got up at 3 a. m.,
and looked at clock.   Went to factory at 5:45.   Was at

home between 3 and 5:45. Went to sleep again. Was not restless. Habit to get up about 4 o'clock. Had no pistol. Prisoner was at factory when I got there. He said, 'I killed old man Jim last night.' About that time some one stepped up. He went to get oil and lampblack. Said no more till he came back from oil room. It was close about 6 o'clock. He said, 'I certainly killed old man Brown last night in the store.' Handed me the key, and said not to throw it in the river. He then went off upstairs. He told me to put key away, and I hid it in the ground. I did not make the key myself. Am not an expert in tampering with locks and keys. Did not make key for U. S. lock. Had U. S. lock, for which Jackson made me a key. Don't think I said I made the key. Didn't say I could make a key to fit any lock. I can prove who made that key. Didn't say I could make a key that would unlock any boat lock on the river. I said, before j. p., I was with him twice or more; not that I went in with him twice. I did not go in the store that night and kill Mr. Brown. Had been promised no favors. Didn't say I had burned negroes' houses." Redirect: "It was his brother George he said not to give away. Brown was stronger than I am. So is Covington. Had on, the evening before, a striped shirt." Shirt is shown him, which he says is like the one Covington had on the evening before. "His pants had a stripe down the leg and a black patch." Cross-examination: "I lifted with Mr. Brown. Have seen Covington and Mr. Brown lift together. Covington gave Mr. Brown all he could carry."

Samuel Turner, testified: "I am j. p. before whom Covington was tried. Heard question put by Tom to Josey. He said: 'You must have misunderstood me. Didn't I tell you some one killed old man Brown?' Josey said conversation took place near the church. Also about the con-

versation about the mill, Josey said Tom Covington went to him that morning, and told him that he [Tom] had killed old man Brown." The testimony taken on justice trial is handed to justice to refresh his memory. He said it was taken down in his presence by Osborne Brown, and afterwards read over in the presence of himself, Josey, and Tom Covington. Defendant objects to his refreshing his memory. Objection overruled. Exception. "Josey said Tom told him he had killed old man Brown. Tom asked Josey if he was not mistaken. 'Didn't I tell you some one killed him?' Did not hear Josey state where he hid the key. I afterwards searched for key, and found it at end of lapper room outside, at Long Island Factory, under the dirt four or five inches. It was next morning, after he made statement the evening before, when it was found."

George W. Burris: "I am 46. Live in 1 mile of Long Island Cotton Mill. Have known Tom Covington 10 or 12 years. Day after homicide I was at home. Came up to lower factory, and went up to upper one. Went back next day. It was second day, day of burying. I saw about 10 steps from front of store, Tom Covington, who came and sat down by me. He talked a good deal about this matter. I said a good way to detect was to look at clothing for blood. When I said that, Tom Covington looked down at himself and said, 'I never thought about that.' On his right leg I saw something that resembled blood. Looked like a sprinkle or couple of drops. It was on inside of his leg. Something took my attention, and Tom Covington walked off, and came back from toward home with a different suit of clothes on. It was ½ hour before he returned. Next saw him coming up to the crowd. Didn't have the same pants on. The first pair of pants he had on were striped. Don't know what became of the pants." Cross-examination: "It was about 9 or 10, a. m., the day of the

STATE *v.* COVINGTON.

burying, that we had the conversation. I swear that there was blood on Tom Covington's pants."

For the defense, Mrs. Covington, wife of the prisoner, testified as follows: "I am wife of prisoner. Remember night Brown was killed. I was at home. Live at my house. Prisoner, myself, and baby. Have but two rooms. One bedroom. Cook in the other. Mrs. Bolick was there, and slept in the same room we did the night of the homicide. Her bed 1 step from ours. Her house is 10 steps from ours. Doors do not face each other. She has five children. They work in mill and were there that night. She stayed with us often. I retired about 8 o'clock. Prisoner works in the daytime. Mrs. Bolick retired at same time. So did prisoner. No light in the house during night. Have a clock. Bell rings at 4 o'clock. Prisoner did not leave home that night. He got up after 5 a. m. I called him, and he was in bed. Did not have his clothes on when he got out of bed. Lit lamp, and built fire in stove. Took seat, and picked his banjo. Fooled with it till I got breakfast ready. Prisoner got up before Mrs. Bolick. He could not have left home without my knowledge. Baby slept behind. Was eating breakfast when 15-minute bell rang. Prisoner came back some time during the day. The day before he had on striped pants, and same coat he has on now. The day of funeral he put on another pair of pants. I told him not to go with dirty pants. Did not change his coat, and put on same old pants after coming back. Wore same old clothes balance of the week. Had same old clothes on when arrested. Saw his clothes frequently, but never saw any blood. It looks like I could have seen it. None on his shirt and coat, as I could see. Mr. Bridges brought pants back, and a letter from him at jail. Brought shirt and slips. Brought them to Elam Josey. They were clothes he had

on day of arrest, and day before homicide. When brought home I examined them, and found no blood. Mrs. Caldwell and Mrs. Bolick were present. Mrs. Bolick burned the pants. I told her to burn or wash them. She washed other clothes. Prisoner has the coat on. I saw lice in jail." Shoes previously exhibited are shown her. She says, look like shoes she bought of Mr. Brown. "I got second pair. Bought them myself for prisoner. Shoes are 9. Think prisoner wears 8. Box was marked 8, shoes 9. Prisoner sold them to his brother Henry. I cover slats for factory, to be used in spinning room, with kind of cloth found in our house." Cross-examined: "Bought shoes myself in August. Prisoner had worked in mill for about 2 years. Store about 20 steps from factory, where he worked all day. He could wear 7 shoes. Did not wear 9. They were too large, and Henry wanted them. I told him to take them back, but he said Henry wanted them. He nor Henry bought any more. Don't suppose had bought pair for himself in 5 years. Miss Essie was not in the store at the time. Nor George or Osborne Brown. Nobody but Mr. Brown, the deceased, and a little negro whose name I did not know. I first heard prisoner's pants had blood on about two weeks ago. Pants had been washed twice. Mrs. Bolick washed them next week after Mr. Brown was killed. Pants came back Friday after prisoner was carried to jail. Did not burn the shirt. Just didn't tell her to burn it. I did not see them burned." A shirt is here shown her, which she says is the shirt prisoner had on night of the homicide. A spot on it is shown her, which she says is not blood. Says she "knows blood when she sees it, and knows black grease, too. Don't know whether blood will come out or not. Shirt has been washed twice. No blood on pants. I looked to see if there was. Also, to see if there were lice, and anything I could see. If I had

found blood it would have alarmed me.  Never asked Minnie Bryan if anybody had seen shirt at Ben Litten's, and did not say, 'For God's sake, let no one see it.'  Mrs. Bolick kept the shirt, and Mr. Bridges took it, I heard. Never asked Sarah Ann not to tell.  No; if she wanted, no man could make her swear.  Night of homicide prisoner came home after changing time about dusk.  Mrs. Bolick was there.  My husband has never come home and gone to bed when I did not know it.  Also know any time he gets up and leaves.  If he went into store, he never brought anything to me.  Picked banjo morning of the homicide, and that day at dinner.  Heard Mr. Brown was dead early that morning.  He was a good man."

Tom Covington, the prisoner, testified in his own behalf as follows:  "Night of homicide he was at home.  So was his wife, child, and Mrs. Bolick.  Went to bed at 8 o'clock. Mrs. Bolick slept in same room.  Was not up after he went to bed until 5 o'clock next a. m.  His wife called him.  Was not out from time he went to bed till time he got up.  Lit lamp at 5:04 a m.  Went and built fire in kitchen.  Wife got up and was getting breakfast.  It was windy night and don't think I woke up all night.  Think factory bell had rung when I woke, but I did not hear it. I got to mill at 6:10.  Was second boss.  Looked after hands and oiled machinery.  Did principal part of marking.  First saw Josey at speeder.  Teamster said he wanted yarn early.  Went and got cup and blacking.  Was dry, went to dynamo room for oil.  Asked father, 'To whom mark yarn.'  As we passed speeder had not seen Josey, nor had any conversation with him.  He did not say anything to me.  I said, 'Pull that coat off before you get it in flyers.'  I did not have any such conversation as Josey testifies to about making key and killing Mr. Brown.  Did not make the key.  Had little conversation with Pope.

Told him yarn was not ready yet ; that Mr. Brown had not brought book down. Nothing else was said. Pope was in mill, and it was raining. I said nothing to Pope about Mr. Brown being killed. At time we were talking did not know Mr. Brown was dead. First heard it from Lee Robbins. I ran and asked several what was the matter. When Lee told me, I went with others to the store. Went to the factory and got my hat and coat. Had on same hat and shirt I did the day before. Remember going to the window to see if Mr. Brown had come to the store. Had not marked all the sacks. Could not put number without book. I helped to turn body over. Caught it about shoulders. Right smart blood little distance from where he lay. Afterwards I went over home,—not as late as 10 or 11 o'clock. I and Lee Robbins fixed bracket on banjo. Went to funeral, and went to dwelling after body was carried there, and held lamp while they were washing and dressing him. Wore same clothing I had been wearing, except pants, which I changed because wife said not to wear old pants to the funeral. No blood was on my pants. Burris did not tell me there was blood on pants. Helped dig grave. After getting out of grave, I sat down next to paling by Mr. Litten. Josey then took me off. Went down road, and stopped at corner of graveyard. He said, 'Don't say anything about seeing me in store, for fear they might think I killed Mr. Brown.' I said to him I would not tell it, provided he did not go back again, unless I was obliged to do so. He cautioned me not to say anything about it. I made no threats to Josey, then or at any other time. We took the walk at his request. I saw Josey come out of the store one time. Was working on the night shift, and one night went to the well to get water. I saw Josey come out of the store door, and said, 'Old fellow, I have caught you this time.' He went on with me

then to the factory, and tried to persuade me to go in store; but I would not, and told him he had better stay out. Saw 65 cents he got. He gave me 35 cents of it, but he owed it to me. I did not want it, but he insisted, and I took it to pay what he owed me. I said nothing about it. Was never in store with Josey. Never saw key before. Never made threats against Mr. Brown, that I remember of. We were friendly. Did not tell Pope I would kill Mr. Brown. If so, it was in fun. Had no grudge against him. Didn't try to kill him with wrench or with broom handle." Letter No. 7 was shown him. Says he wrote part, and part he did not. Said he did not write, "Elam, we did not go in store but one time," in the letter. "Remember writing him something like it, but I said 'you,' instead of 'we.'" Again, "didn't say, 'We did not take any goods,' but wrote, 'You did not take any goods.' I wrote him that he had two 25-cent pieces, one 10, one 5, and alluded to the night he was caught by me coming out of store. Day Mr. Brown was killed, I had on striped pair patched pants, on leg and knee and on seat. Think shirt exhibited is one I had on. Same coat I now have. Put on same clothes next morning, and continued to wear them till day of burial, and then only changed my pants, and after returning put same pants on, and had on the same clothes when I was arrested and sent to jail. Sent clothes home from jail by Bridges, and said, 'Tell my wife to hang them out. They have lice on them.' Sent no word to burn pants, and saw no blood on shirt or pants. Spot on shirt is factory grease. Plenty of lice in jail. Wife bought the shoes, I suppose. Told her to buy a pair. She said she got them from Mr. Brown. Told her to get 8. Shoes were 9, but box 8. Did not look at them till I had put them on, and found too large. I traded shoes with my brother Henry. Wife did all the buying,

117—54

except such things as she could not carry home. Weighed 130 when I was carried to jail. Mr. Brown 170 or 175, and he was strong man. He didn't .stand back from anybody in lifting, and was stronger than I am." Cross-examined: "Josey said not give him away. Mr. Brown was kind to me, and I liked him. Saw Josey coming out of store three or four months before Mr. Brown was killed. I had no talk with him from the time he gave me money till we talked at the grave, except word or two occasionally. He came out of door, like others, and said he got 65 cents. Did not go and tell Mr. Brown, because it was not my business to carry news. Never told my father, or anybody. Never wanted to tell what sort of debt he owed, which is mean. I said in letter he gave me 35 cents. It was for a pair of home-made knucks." Prisoner says he wrote letter 5. "Part of it is true; part, false. Went up store when I heard Mr. Brown was killed. Great deal excitement. Said about having seen Josey go in store. Went from store to factory after hat and coat, then back to store, then home, about two hours, to dinner. Set at home and picked banjo. Picked one thing and then another. Was sharply grieved at death of Mr. Brown, but never picked banjo in presence of death before. Talk I had with Josey was about his coat. Afraid he would catch it in machine. He was at speeder, and it was running. It was free, voluntary statement I made to Bridges coming to jail. Did not tell Bridges that Josey swore about being in store and my being with him was true." No. 2 is shown him, and he says front part of it he wrote; other part he thinks Josey wrote. "Pair of knucks were in my house when Mr. Brown died. Key is made of old file, but I did not make it. Never made any keys as I remember. Filed one out with George Brown. May have read Jesse James' book. Had it about year. Did not make

key in prison of steel, nor go with Ben Lytton to get tobacco." Redirect: "Had conversation with Josey in jail. Talked with him two or three times. Said he told that lie because detective and Bridges said they would hang him, and he was scared, and did not know what to do. Said he was going to do what he could, and trust in the Lord."

John Best: He is now in jail. "Says prisoner and Josey have been writing notes. Went in room one day and lay down. Josey came in and said, 'Read this.' I read it. No. 7 is the letter. Says, 'If I keep this till court, will it do me any good?' Said I was no lawyer, and could not say. I gave him a pencil with a rubber on it. He took it, and rubbed out 'you,' and put 'we' in two places. Afterwards said, 'Now, read it again. Don't you think it will do me good? Whatever you do, don't give me away.' Said, 'I am for getting Josey out.' Josey then went to prisoner's door, and got up a conversation. Said, 'Tom, I did you a great wrong, and am sorry for it. They told me they would hang me, and I was scared.' I said, 'You were a fool. No two or three men could hang you, without evidence.' Lice have been in jail ever since I have been there." Cross-examined: "The 'we' he rubbed out was near top. Can't say it was the 'we' after Elam. He rubbed out first 'we.' Don't know that he rubbed out the next one. Can't point out others." Letter is shown him, which he says he wrote, marked "Exhibit 15," and another, marked "16." "Said he never stated to any one that both said they were going to prepare to die before court. Says what is in his letter is true. Prisoner and Josey were talking. Josey said, 'Eave-drop him. He would pick him.' They were whispering all day. Prisoner said, 'I am going to pray and get ready for a better world.' Josey said, 'I am too.' Heard

prisoner say, 'I am going to own it at court.' Said to
Josey, 'Don't give me away.' He took it and rubbed out
'you,' and put 'we' in two places. Afterward said, 'Now
read it again,' and says, 'Don't you think it will do me
good?' and said, 'Whatever you do, don't give me away.
They might come and hang me before court.' Heard it
on 19th, and wrote letter on 20th. Never heard him say
who would come and get him." Re-direct: "Last letter
was written to Pink Yount, the jailer. Mr. Yount told
me to listen and hear, and report everything I heard either
one of the boys say."

Thomas Covington, prisoner, recalled said about the
whispered conversation testified to by Best, "I had told
him (Josey) not to tell any such tales on me as he told at
j. p. trial; for, if he did, they would be bound to hang
me. Said he was sorry and wanted me to prepare for a
better world. He said he was going to acknowlege all
that he had done, and said that I would do so too."

The court recapitulated the testimony and—saying
to the jury that his notes of the testimony are only to
refresh their memory and not to govern them, that they
were sole judges of what the witnesses had said, and
wherever their recollections of what the witnesses had
said differed from his notes, they would be governed by their
recollections and not his notes—charged the jury as fol-
lows:

"The defendant is charged with the murder of one James
Brown, as charged in the following bill of indictment:
[The bill of indictment is here read.] The court charges
you that you should not allow any feelings of indignation
which you may have on account of the nature of the hom-
icide to prejudice you against the prisoner, or allow any
feelings of sympathy or pity that you may have for the
prisoner, or his wife or child, to prejudice you in his favor.

Under your oaths, it is your duty to render a verdict according to the evidence; and if this, and this alone, satisfies you that he is, beyond a reasonable doubt, guilty of the murder, as charged in the indictment, you will return a verdict of guilty. On the other hand, if the evidence does not satisfy you, beyond a reasonable doubt, that he is guilty, then you will return a verdict that he is not guilty. A good deal has been said about the improper use of money by the prosecution in this case, and improper conduct of the family of the deceased. The court charges you that there has been no evidence of the improper use of money by the prosecution, or improper conduct on the part of the family of the deceased, and these arguments you will not consider in making up your verdict. In North Carolina there are three degrees of felonious homicide, to-wit: Manslaughter, murder in the second degree, and murder in the first degree. The first, to-wit, manslaughter, is the unlawful and felonious killing, without malice, either expressed or implied, and without any mixture of deliberation whatever. Murder in the second degree is where a person forms in his mind a purpose, design, or intention to unlawfully kill a human being, with malice, but without premeditation. Murder in the first degree is any unlawful killing which is perpetrated by poisoning, or lying in wait, or any other kind of wilful, deliberate, or premeditated killing, or which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem, burglary, or other felony. The court charges the jury that, in no view of this case, as presented by the evidence, is the defendant guilty of manslaughter or murder in the second degree. He is either guilty of murder in the first degree, or not guilty, and you will so find. The court further charges the jury that,

in this case, the law raises no presumption against the
prisoner, but every presumption of the law is in favor of
his innocence; and in order to convict him of the crime
alleged in the indictment, every material fact necessary
to constitute such crime must be proved, beyond a rea-
sonable doubt, and if the jury entertain any reasonable
doubt upon any single fact or element necessary to con-
stitute the crime, it is their duty to give the prisoner the
benefit of the doubt and acquit him. Again, if it is pos-
sible to account for the death of the deceased upon any
reasonable hypothesis other than that of the guilt of the
defendant, then it is your duty to account for it, and find
the defendant not guilty.

"The State contends that it has satisfied you beyond a
reasonable doubt of the guilt of the defendant, and relies
—first, on the threats, as testified to by several witnesses,
whose testimony you heard, and which I have read to you,
and which you will remember. The court charges you
that these alone would not warrant you in convicting the
defendant, but are circumstances only, which you may con-
sider and weigh with the other testimony in the case.
Secondly, the State relies on the testimony of the witnesses
which tends to show that the defendant had for some time
been entering the door of the store by a false key, the con-
tention being that he entered the door the night of the
homicide with intent to commit larceny, which is a felony,
was caught by Mr. Brown, and, to conceal the crime of
larceny, killed the deceased. In this connection, the court
charges the jury that if, from all the evidence in the case,
you are satisfied, beyond a reasonable doubt, that the
defendant entered the store of James Brown the night of
homicide with intent to commit larceny, which is a felony,
and while in that store killed the deceased, although he
did not intend or expect to kill him when he entered said

store, he is guilty of murder as charged in the bill of indict-
ment, and you should so find.    Third, the alleged conduct
of the defendant the morning after the homicide.    The
evidence tended to show that, the morning after the homi-
cide, the defendant had several conversations with Josey,
and that he went to the window looking towards the store
several times, and, in reply to a question from witness Pope,
about old man Brown coming down that morning, said,
'I don't suppose he will,' and to Preston Adams, who asked
him what he was looking at, standing at the window, and
to which he said, 'Watching it rain,' and the other things
testified to by the different witnesses, which you will con-
sider and weigh.    Fourth, to the evidence tending to show
he had blood on his pants.    The testimony bearing on this
point is that of Burris, who was sitting by the tree talking
to prisoner and called his attention to some spots on his pants,
and that pretty soon thereafter the prisoner went towards his
home, returning in a short time with a different pair of
pants.    Next testimony bearing on the point is that to
show the burning of the said pants at the instance of the
prisoner's wife, and the alleged spot of blood on his shirt,
which was brought into court and shown you, and which
Dr. Campbell testifies, in his opinion, is blood; and then
the testimony of witness, the girl Myers, who said prison-
er's wife sent word to Mrs. Bolick, 'For God's sake, let no
one see that shirt.'    You will consider the testimony and
circumstances surrounding this connection, together with
the testimony of Dr. Campbell and Mrs. Adams as to the
grease spots coming out after washing; and if, beyond a
reasonable doubt, you are satisfied that there was blood on
his pants and blood on his shirt, you will consider these
facts in connection with the other facts and circumstances
in the case.    Fifth, to the confession of prisoner to Elam
Josey, as testified to by said Josey.    Now, if you believe,

beyond a reasonable doubt, that this witness told the truth, and that the prisoner, when he made the confession as alleged, told the truth, the court charges you that the defendant is guilty of murder in the first degree, and you should so find. The State says he is to be believed, because he is corroborated by the letters which the prisoner wrote Josey, and which you heard read ; by the testimony of several witnesses, who saw prisoner and Josey talking at various times and places, soon after the homicide, as testified to by said witness Josey ; by the finding of the key in the very place which Josey stated he had put it ; by the finding of the alleged stolen shoes; and by other testimony and circumstances, including that of John Best, the witness, who said he heard prisoner say he would own it at court, and that of witness Bridges, who said prisoner had told him, on the way to court, that what Josey had said on trial was true. The court charges you that, in North Carolina, our Supreme Court has held that the unsupported testimony of an accomplice will warrant a jury in convicting provided the jury is satisfied of its truth beyond a reasonable doubt. The weight of this testimony is for you, and you should weigh it carefully, and with deliberation, giving the prisoner the benefit of any reasonable doubt. These are some of the contentions of the State, and the court charges you that, if you are satisfied, from the testimony, that the defendant is guilty, beyond a. reasonable doubt, you will say so, unless the testimony of the prisoner raises a reasonable doubt in your mind.

"And the prisoner says his testimony and explanation of his conduct, together with his explicit denial, is sufficient to raise this reasonable doubt, and it is a question for you to consider and decide. He says that the threats, as testified to by the State's witnesses, and as a circumstance relied on by the State as tending to prove his guilt, are not

true.   He denies the truth of the testimony as to his hav-
ing entered the store by a false key, and explains his
alleged conduct in going to the window morning after the
homicide by saying he was looking for Mr. Brown to come
to store and bring a book, from which he was to get *data*
to mark certain yarns; and he denies the several alleged
conversations with Josey.   In regard to contention of State
as to blood on his pants and shirt, he says he had no such
conversation as was testified to by witness Burris; that he
did change his pants, but it was at the request of his wife
not to wear the old pants to the funeral.   And the burn-
ing of the pants he explains by the testimony of his wife
and others that it was on account of the suspicion of lice,
and denies there was any blood on his shirt, saying it was
grease gotten off machinery.   As to the confessions of
Josey, he says Josey is not to be believed because he is
under arrest charged with the killing of deceased himself,
and that he is induced to become a witness against him by
the hope of immunity from punishment, by the hope that
it would go easier with him in the case he implicated some
one else in the crime, and by the further admitted fact, by
said Josey, that, in another trial, he had sworn falsely
about the same matter.   The jury should take into consid-
eration such facts in determining the weight which ought
to be given to such testimony, and testimony given under
such hope and contradiction.   In regard to the letters, he
says he wrote them, except the word 'we' was substituted
for 'you,' and sustains himself, by the statement of John
Best to having seen Josey erase 'you' and put 'we' in the
letter.   In this connection you will consider the testimony
of Maj. Finger and Mr. Brown, and, taking all the evi-
dence regarding the letters, you will consider and give it
such weight as you may think it entitled to.   If you
believe, beyond a reasonable doubt, that the letters were

not changed, as alleged by the defendant, and that he told what was untrue when he said he wrote 'you' for 'we,' it is a circumstance which you will consider as tending, with the testimony, to prove his guilt.  In determining whether he swore falsely, you will consider the testimony of John Best, who said he saw Josey change 'you' to 'we.'  But, as testimony independent and apart from that of the State, the prisoner says his own denial is sufficient to raise a reasonable doubt in your mind, and you ought to acquit him.  The law gives the accused the right to testify in his own behalf, but his credibility and the weight to be given his testimony are questions exclusively for the jury, and in weighing the testimony of defendant you have a right to take into consideration his manner of testifying, the reasonableness of the story, and his interest in the result of this case ; and you are to say whether it is true, or for the purpose of avoiding a conviction.  Another defense interposed by the defendant in this case is what is known in law as an 'alibi,'—that is, that the defendant was at another place at the time of the commission of the crime ; and the court instructs the jury that such a defense is as proper and legitimate, if proved, as any other, and all the evidence bearing on this point should be carefully considered by the jury, and if, in view of all the evidence, the jury believe the defendant was at another place than that where the homicide was committed, at the time of its commission, they should acquit the defendant.  In order for it to be of avail, it must be such as to show that, at the very time of the commission of the crime charged, the accused was at another place so far away, or under such circumstances, that he could not, with any ordinary exertion, have reached the place where the crime was committed, so as to have participated in its commission.

"These are the leading contentions of the State and of the defendant. You will consider them all carefully, keeping in mind the presumption of law that the defendant is innocent. You will consider all the testimony in the case, and when it is conflicting reconcile it if possible, and if you cannot, in determining which to believe, look at the testimony of good character offered to support witnesses on one side or the other, as case may be, and also to discredit them, their interest in the result of this controversy, their demeanor on the stand, and any other facts or circumstances calculated to uphold or dishonor their testimony. After doing all this, and upon the whole testimony, if you have a reasonable doubt of defendant's guilt, you will find him not guilty. The rule which clothes every person accused of crime with presumption of innocence, and imposes on the State the burden of establishing his guilt beyond a reasonable doubt, is not intended to aid any one who is in fact guilty of crimes to escape, but is a humane provision of law, so far as human agencies go, to guard against the danger of innocent persons being unjustly punished. So, if, upon the whole evidence, you believe beyond a reasonable doubt the defendant is guilty, you will return a verdict of guilty."

There was a verdict of guilty of murder in the first degree. The prisoner moved in arrest of judgment, upon the ground that it appeared upon the face of the bill that the killing of the deceased, Brown, is alleged to have happened in September, 1895, a day which had not yet arrived, and upon the further ground that it is not alleged in the bill that the prisoner unlawfully killed said Brown. Motion overruled, and the prisoner excepts. The prisoner then moved for new trial, for error of court in admitting and rejecting testimony to which prisoner objected in apt time, and excepted, as specified above, and upon the further

ground that the court erred in instructing the jury—first, that murder in second degree is where defendant forms in his mind a purpose, design, or intention to unlawfully kill a human being, with malice, but without premeditation; second, that murder in first degree is any unlawful killing which is perpetrated by means of poisoning, or lying in wait, or any other kind of wilful, deliberate, and premeditated killing, which is committed in the perpetration or in the attempt to perpetrate any arson, rape, robbery, mayhem, burglary, or other felony; third, in instructing the jury that, "in no view of case, as presented by the evidence, is the defendant guilty of manslaughter or murder in the second degree;" fourth, that the court erred in relating evidence of witness Burris to the effect that Burris called prisoner's attention to spots of blood on his clothes, when Burris did not so testify, but testified as above set forth. The court overruled motion for new trial, and gave judgment of death. Defendant appealed.

*The Attorney General* and *L. L. Witherspoon*, for the State.

*Messrs. L. M. McCorkle, C. M. McCorkle* and *S. J. Erwin*, for the prisoner (appellant).

AVERY, J.: His Honor excluded from the jury the question of murder in the second degree and instructed them that in no view of the case as presented by the evidence was the prisoner guilty of murder in the second degree or manslaughter. To this the prisoner excepted. The charge is correct if there is no evidence of murder in the second degree or of manslaughter. The evidence relied upon by the State is the confession of the prisoner to the witness Josey, and circumstances detailed by other witnesses tend-

STATE *v.* COVINGTON.

ing to confirm it.   Upon the truth or falsity of the confession the guilt of the prisoner entirely depends.   If the confession of the homicide is a confession of murder in the first degree, and of neither manslaughter nor murder in the second degree, the charge is correct, for there is no evidence of either of these latter offences.   *State v. McCormac*, 116 N. C., 1033.

This brings us to a consideration of the confession of the prisoner.   Omitting what is immaterial and noticing only that part which goes to show deliberation and premeditation, the prisoner said "I watched my chance, and jumped on the old man and wrenched his pistol and the old man hollowed murder.   Then I shot him through the body. The old man said 'You have got me.'   I aimed to shoot him, and this must have been when I shot him in the neck, and I shot him again."   Conceding when he was watching his chance that, though deliberating and premeditating, his deliberation and premeditation were only extended to making an assault upon the deceased for the purpose of disarming him, and that his first shot was fired on the impulse of the moment because of the outcry of murder raised by the deceased, the second and third shots which were fatal ones were fired with deliberation and premeditation according to the prisoner's confession and with the intent to kill.   "I aimed to shoot him."   These words can mean nothing else than a deliberate and premeditated attempt to shoot the deceased.   To aim to shoot a person, under the circumstances detailed by the prisoner, means something more than taking aim at him with a deadly weapon.   That may be done suddenly and upon the impulse of the moment.   But here the words signify a purpose deliberately and premeditately formed in the mind, immediately followed by an act to execute it—the purpose to shoot the deceased, and the aiming and shooting to carry

out the purpose.   Under the decisions of this Court in *State* v. *McCormac, supra,* and *State* v. *Norwood,* 115 N. C., 791, concurring with those of every other State where a similar statute concerning murder has been adopted, it is immaterial in determining the degree of murder, how soon after resolving to kill the prisoner carried his purpose into execution.   The only question was, did he form and execute the purpose in the manner described in the statute? This question must be answered in the affirmative if the confession of the prisoner is to be believed ; and if the confession is not to be believed, then he is not guilty in any manner of the crime charged, as he did not commit the homicide.   By their verdict the jury have shown that they believed the confession to be true.   Applying the test which has been suggested in *State* v. *Gadberry,* decided at this Term, we find that had the confession of the prisoner been incorporated by the jury into a special verdict as their finding of the facts, the court would have been constrained to declare the prisoner guilty of murder in the first degree, because the intent with which the killing was done is found inseparably connected with the finding of the act of killing.   So that in this view of the evidence the killing must have been premeditated, according to the only testimony that establishes the fact of shooting.

It may perhaps be claimed for the prisoner that inasmuch as the fact of killing with a deadly weapon raised only a presumption of murder in the second degree, and it was the duty of the State to prove beyond a reasonable doubt the premeditation and deliberation necessary to constitute murder in the first degree before a verdict of guilty of such crime could be rendered, the court should have left that question to the jury, and instructed them, unless they were satisfied beyond a reasonable doubt of the fact of premeditation and deliberation, to render a

verdict of guilty of murder in the second degree. This would have been his Honor's duty, if the fact of the homicide with a deadly weapon could have been separated from the evidence establishing it and showing the circumstances under which it took place. But it is almost impossible to conceive of a case of that character, except upon a naked confession of such homicide. The confession in this case is not simply an admission of the homicide; for the prisoner not only admits the act of killing with a deadly weapon, but gives a full and detailed account of the manner and the purpose with which it was done. Accepting the account as true, it is impossible to perceive any theory upon which the question of murder in the second degree could have been submitted to the jury, or how they could have been justified in rendering a verdict of guilty of such offence, or any other offence, than murder in the first degree. The effect of a presumption arising from a killing with a deadly weapon, admitted or proved, before the Act of 1893 was injurious to the prisoner and operated entirely in behalf of the State, so that the burden was upon him to show mitigation or excuse. Notwithstanding such presumption, when it appeared that, in no aspect of the testimony and under no inference fairly deducible from it, the prisoner was guilty of murder, it was error in the court to refuse to instruct the jury that they must not return a verdict for any higher offence than manslaughter. *State* v. *Miller,* 112 N. C., 878. Under such circumstances it was the duty of the Judge to exclude altogether from their consideration the question of murder, notwithstanding the presumption that such was the crime committed by the prisoner. The reason was that the evidence upon which the State relied to raise the presumption by showing a homicide with a deadly weapon at the same time had the effect to show that the offence was mitigated to

manslaughter, or altogether excusable. The rule of law is the same under the present statute when the prisoner seeks to avail himself of the beneficial effects of the presumption in his behalf. Where the testimony upon which he relies to establish a homicide with a deadly weapon, in order to raise a presumption of murder in the second degree, not only proves such homicide, but has a tendency to prove murder in the first degree and under no inference fairly deducible therefrom is the prisoner guilty of murder in the second degree or manslaughter, the court should instruct the jury that it is their duty to render a verdict of guilty or not guilty. Under the construction of the statute by this Court in *State* v. *Gilchrist*, 113 N. C., 673, and *State* v. *Norwood, supra,* the third section does not give jurors a discretion when rendering their verdict, to determine of what degree of murder a prisoner is guilty. They must render a verdict according to the evidence, and believing a prisoner guilty beyond a reasonable doubt of murder in the first degree it is their duty so to find, however much inclined to show mercy by rendering a verdict for a lesser offence. Their obligation in that respect has not been changed by the statute and is the same as it was upon the trial for homicide before its enactment, and the question was whether the prisoner was guilty of murder or manslaughter. This question has been settled by our decisions, not only in construing the act under consideration, but also the similar one dividing the crime of buglary into two degrees. *State* v. *Alston,* 113 N. C., 666 ; *State* v. *McKnight,* 111 N. C., 690 ; *State* v. *Fleming,* 107 N. C., 905.

We are aware that the construction which has been placed upon this section of the Act in some of the States where a similar provision is found in the statutes dividing murder into degrees, is different from ours. In all cases of murder in those States, the jury, having a discretion in

rendering their verdict to determine of what degree the prisoner is guilty, it is error in the court to confine their consideration to the question of guilty of murder in the first degree or not guilty, and thereby deprive them of the right to exercise such discretion. Not having such discretion in this State, and there being no evidence in this case but a confession of murder in the first degree, with circumstances to corroborate the confession, his Honor was correct in refusing to submit the question of murder in the second degree or of manslaughter to the jury.

The other material question raised by the prisoner is upon that part of the charge, which is in the following language: "The court charges the jury that if from all the evidence in the case you are satisfied beyond a reasonable doubt that the prisoner entered the store of James Brown on the night of the homicide, with the intent to commit larceny, which is a felony, and while in the store, killed the deceased, although he did not intend or expect to kill him when he entered the store, he is guilty of murder as charged in the bill of indictment and you should so find."

To make this instruction applicable to the case, it is only necessary to say that there is evidence which tends to show that the homicide for which the prisoner was tried was committed in the attempt to perpetrate the crime of larceny, which is a felony under our law. As to the correctness of the charge of the court, as a legal proposition, there can be no question in this respect, for a homicide committed in the attempt to perpetrate a felony under the circumstances detailed in the evidence in this case, is murder and was murder before the Act of 1893, Ch. 85. By that statute, murder committed in the perpetration of a felony is now murder in the first degree. The able counsel of the prisoner, however, earnestly contends that under the indictment in this case, the court should not

117—55

have submitted the question of murder in the first degree, in the attempt to perpetrate a larceny, to the jury, inasmuch as there is no allegation to that effect in the indictment; and he relies upon the authority of Mr. Bishop to sustain that contention. The indictment does not contain such allegation and the authority relied upon is to the effect for which it is cited. But another equally able expounder of criminal law, Dr. Wharton, takes the opposite view in his work on homicide, page 387, and cites various decisions of courts of last resort to sustain him. This Court, however, has decided the question adversely to the prisoner in *State* v. *Gilchrist, supra.* The statute under which the prisoner is indicted contains in section 3 the following provision : "Nothing herein contained shall be construed to require any alteration or modification of the existing form of indictment for murder, but the jury before whom the offender is tried shall determine in their verdict whether the crime is murder in the first or second degree." The plain words of this section require no construction from the Court, and, in order to sustain the contention of the counsel for the prisoner, it will be necessary to declare a part of the section unconstitutional and overrule the decision of this Court. Under this indictment before the Act of 1893, the trial Judge would have been sustained in an instruction submitting the question of murder in the attempt to perpetrate a larceny to the jury, without any specific allegation to that effect. The Act provides that murder of that character is murder in the first degree, and further provides that nothing therein contained shall be construed to require any alteration or modification of the existing form of indictment. These provisions are positive enactments that it is now unnecessary to make the specific allegation contended for by counsel to sustain the charge of the court, inasmuch as it

STATE v. COVINGTON.

was not necessary before the Act. The form used in this case is that authorized by the Act of 1887, Ch. 58, and the constitutionality of this Act has been sustained in the case of *State v. Moore*, 104 N. C., 743. There is no reason for overruling that case.

This aspect of the case presented by the court is likewise dependent upon the preliminary finding by the jury that the prisoner's confession as to the killing, with all of its details, is true. The court left the jury to say whether, after determining that the prisoner had aimed to kill the deceased, they were also satisfied that he entered the store with the intent to commit a felony. Looking at the evidence as we do, the jury must in this aspect have found the killing with the premeditated intent upon the prisoner's confession as a basis, because that was an inseparable part of the confession of breaking into the store. Without the confession as a whole the breaking could not have been shown, and with the confession found it was mere surplusage to ascertain the intent of entering, after finding a deliberate killing. So that in no view of the testimony, leaving out the confession, would there have been sufficient evidence to show the prisoner guilty of any offence; and in no aspect of the testimony, if the confession were believed, was he guilty of any less offence than murder in the first degree. We do not deem it necessary to discuss the other exceptions. After giving them a careful consideration we find no error. The judgment is affirmed.

Affirmed.

FURCHES, J., having been of counsel in the court below did not sit on the hearing of this appeal.