## STATE v. BISHOP.

(Filed November 18, 1902.)

1. HOMICIDE—*Murder—First Degree—Premeditation and Deliber-ation—Evidence—Sufficiency—Acts 1893, Chap. 85.*

There is not in this case sufficient evidence of premeditation to sustain a conviction of murder in the first degree.

CLARK and MONTGOMERY, JJ., dissenting.

INDICTMENT against June Bishop, John Belfield and Jas. Stevenson, heard by Judge *George H. Brown* and a jury, at April Term, 1902, of the Superior Court of BERTIE County. From a verdict of guilty of murder in the first degree and judgment thereon, the defendants appealed.

*Robert D. Gilmer, Attorney-General,* and *L. L. Smith,* for the State.

*W. R. Johnson,* for the defendants.

STATE *v.* BISHOP.

FURCHES, C. J.   The prisoners are indicted for the murder of Thomas Stevenson, found guilty of murder in the first degree, and are now under sentence of death.   The evidence discloses the following facts:

C. T. Peele is a merchant in Bertie County, and on the morning of the 9th April, Joe Peele left an order at his store to let Jim Stevenson have twenty pounds of meat and a sack of meal; that evening about 4 or 5 o'clock, Peele's wagon drove up to the store with the prisoners in it.   Melton Belfield, it seems, came up about the same time.   It seems that they had been to some kind of a gathering at a place called Kelford, that day, and were returning.   It further appears that all three of the prisoners and Melton Belfield went into the store, and Jim asked for the meat he was to get.   Peele, the owner, and Stevenson, the deceased, who was a clerk, were both in the store.   Jim said he wanted to look at some shoes, and the deceased said to Peele, "You show him the shoes, and I will go and weigh the meat," which seems to have been in another room.   About this time, Melton Belfield commenced to curse the deceased, calling him the meanest thing he could think of, among others, a "son-of-a-bitch."   The deceased said he would not take that, and reached up and got his pistol.   Peele ordered them all out, and they all went but Melton.   He did not go at once, and Jim came back in the store and took him by the arm and tried to get him out. But it does not seem that he succeeded, as Peele says he gave Melton some "soda" and went with him to the door, and turned to go and weigh the meat, and met the deceased going to the door.   He then heard pistols firing, turned back, and they were all out of doors, and the deceased was shot. There were quite a number of shots, he thinks as many as ten or fifteen, but he saw no one shoot but Melton, and did not see either of the prisoners have a pistol, nor take any part in the fight.   These are as near the facts as we can get them from Peele's evidence.

It seems that the deceased was shot in four places, and as many as seven shot holes were in his clothing, and, from the evidence of Dr. Capehart, the shots were fired from behind. Some of the witnesses, who were some distance from the place of the homicide, thought there were as many as twenty shots. It does not appear whether the deceased's pistol was empty or loaded.    No witness saw either of the prisoners shoot, nor have a pistol.    Stevenson was killed almost instantly.    Melton Belfield escaped, and was afterwards killed in being arrested.

This was an unfortunate affair.    Two men are dead and three are now under sentence of death.    The prisoners are further unfortunate; the man that was killed was a white man and the prisoners are negroes, and are kin to Melton Belfield.

The charge of the Court is not sent up, and we must presume it was correct, except as to the refusal to give the special instructions asked by the prisoners.    These were as follows:

1. That upon the evidence, the jury can not find a verdict of murder in the first degree.

2. That upon the evidence the jury can not find a verdict of murder in the second degree.

3. That upon the evidence, the jury should render a verdict of not guilty.

From the many decisions of this Court since the Act of 1893, dividing murder into two degrees, the law of murder in the second degree, manslaughter, excusable and justifiable homicide, is the same as before the passage of that act, except as to the punishment, which is not capital now.    *State v. Rhyne,* 124 N. C., 847.    And outside of the enumerated cases, such as "poisoning, lying in wait," etc., to make the crime murder in the first degree and a capital felony, *the State must prove,* in addition to malice, that the killing was done with "deliberation and premeditation." And it is held that such deliberation and premeditation does not mean

that the prisoner intended to kill at the moment he gave the fatal blow. This is not sufficient. But he must have cooly and deliberately considered the consequences of his act before putting it into execution, in order to make the killing murder in the first degree and a capital felony. *State v. Foster,* 130 N..C., 666, which case carefully reviews the statute and the decisions of this Court thereon, and is an authority for the law as stated above. And we see no evidence in this case, showing or tending to show, "premeditation" or "deliberation" on the part of the prisoners, if they did the killing. The store at which the killing took place was a public place, to which parties were invited and expected to go. They were therefore not trespassers nor intruders; and when the difficulty commenced between Melton Belfield and Thos. Stevenson (the deceased), and they were ordered out of the store, the prisoners immediately went out, and Jim Stevenson went back in the store, took Melton by the arm, and tried to get him out; Melton did not go out immediately, and Peele gave him some "soda" and he then went out. Peele then turned and started to the ware-room to weigh the meat, and met the deceased going to the door with his pistol, and very soon thereafter the firing commenced. Peele at once turned back and, when he got to the door, Melton, deceased, and the prisoners were all out in the road about fifteen feet from the store. The deceased was down. And he saw no one shoot except Melton. Besides this store being a public place where all persons were invited to go, the undisputed evidence is that one Joe Peele had that morning left an order at the store to let Jim Stevenson have 20 pounds meat and a sack of meal; and that evening Peele's wagon drove up with the prisoners in it or with it, and they went in the store, and Jim asked if Peele had left the order, and was told that he had.

Upon these facts the Court, though specially requested to

do so, refused to instruct the jury "that upon the evidence the jury can not find a verdict of murder in the first degree." In refusing to give this instruction there was error.

But to entitle the State to a verdict for anything, it must prove the killing by the prisoners. That Thomas Stevenson was killed there is no dispute. But the evidence strongly tends to show that he was killed by Melton Belfield, and the prisoners deny that they killed him. Admitting that there was some evidence tending to show that there were other shots fired besides those Melton fired (and this is the only evidence showing or tending to show that any one but Melton fired), not a single witness points out or identifies any one except Melton that did fire. It may be well said from this evidence that, if any shots were fired except by Melton and the decesaed, it was by some one of the prisoners, but which one, or which two, was it that fired? No witness says or undertakes to say which one it was. Indeed they say they can not say which one, nor can they say that they all fired. Unless this could be done, then in the entire absence of any evidence that the killing was the result of a conspiracy, agreement or understanding between the prisoners, or the prisoners and Melton Belfield, to commit the murder, none of the prisoners can be convicted. If they could, it would be to convict an innocent man rather than fail to convict a guilty man. This is not the law. Where two or more are indicted for murder, and the evidence shows that one of the prisoners is guilty, but the evidence fails to show which one, they must all be acquitted.

"Although it may be positively proved that one of two or more persons committed a crime, yet it is uncertain which is the guilty party, all must be acquitted. No one can be convicted till it is established that he is the party who committed the offense." *Campbell v. People,* 16 Ill., 17., 61 Am. Dec. 49.

If the evidence showed that all the prisoners participated in killing James Stevenson, then they would all be guilty of the same offense, if guilty at all. But we submit that the evidence does not show this to be the fact in this case. And as it is contended on the part of the State that it does and as the entire evidence is made a part of the case on appeal, we insert as a part of this opinion the entire evidence; and we are satisfied upon an examination of the entire evidence it will not show as the State contends it does: 1. That the "four went in a body." 2. "That soon thereafter * * * all four were chasing the deceased and firing at him as he ran." 3. "That all four jumped in a wagon and drove hurriedly off." 4. "Firing at him as he ran." 5. "All engaged in the joint common assault." 6. "The pursuit by four men following up one who is fleeing and trying in vain to escape." 7. "That the prisoners and Melton going off together." 8. "The deceased acknowledged himself vanquished by fleeing, and was pursued by superior numbers." 9. "And again after he was down and all four participating in the last bloody and savage act." 10. "When (if the evidence is believed) the four men pulled out their pistols and commenced firing upon one man, and continued to pursue and fire upon him while falling." 11. "The evidence is that in a few minutes all of them were using pistols." 12. "The white man is seen out of doors running for his life, with all four chasing him, and four pistols barking on his back." 13. "Then all four men jumped in the wagon and drove off."

We say that a careful perusal of *all the evidence* will fail to show that the above statements were proved as is claimed to have been done by the State.

The common law definition of murder is stated by Sir Michael Foster on page 255 of his Crown Laws as follows: "In every charge of murder, the fact of the killing being first proved, all the circumstances of accident, necessity or in-

firmity are to be satisfactorily proved by the prisoner, unless they arise out of the evidence produced against him; for the law presumeth the fact to have been founded in malice, until the contrary appears." This definition of murder at common law has been adopted by the Courts of this State, and has never been departed from so far as we know. This definition applies to murder in the second degree, since the Act of 1893 dividing murder into two degrees.

But it is now claimed for the State that the common law definition presumes "malice and premeditation." If this were true, that when the killing was shown "premeditation" was presumed, the State need only show the killing to make it murder in the first degree. If this were so, it at once emasculates the statute of 1893, and every murder would be murder in the first degree unless the prisoner could prove the negative—that he did not *premeditate.* But the statute itself expressly provides that to make the offence murder in the first degree, the State must prove the "premeditation."

There was error also in refusing to give the second and third prayers for instructions.

Error.

The evidence is as follows: "Your name is C. T. Peele? Yes, sir. Did you know Mr. Stevenson? Yes, sir. Please state all the facts concerned with the killing of young Mr. Stevenson. On the morning of the 9th April Joe Peele came to our place of business and told me to let Jim Stevenson have twenty pounds meat and sack of meal. About an hour a wagon passed the door. About 4 or 5 o'clock Peele's wagon drove up. Jim Stevenson walked in and said, did Mr. Peele leave word here to get any meat? I told him yes. We waited a few seconds and about that time Jim Stevenson said, 'We want to look at some shoes,' and Mr. Stevenson said, 'You go and show them the shoes and I will weigh the

meat and meal.' Stevenson went in the grocery room and I went for the shoes. Melton Belfield came in and cursed, and in a few minutes June Bishop said 'Stevenson (meaning the clerk) come on and weigh the meat.' John Belfield said come on over where they were, and laughed. Melton Belfield was in there quarreling and I ordered him out because he was bringing on trouble. What happened then? Melton kept cursing and Mr. Stevenson spoke to him and said he was getting tired and reached up and got his pistol and Melton remarked he was not scared of him. I walked around the counter and gave soda to Melton and told him to get out. That was at the door. I was going to the door. Mr. Stevenson was around the counter. I was at the door. Nobody in the store but us three. All rest went out door (the other three men.) John Belfield came back in there and was at the door. He came in there and took hold Melton's arm and asked him to come out, but he did not come out. John went out. I went with Melton to the door and Melton called Mr. Stevenson a damned son of a bitch and Mr. Stevenson made for the door. The three (defendants) were standing there. What other men were there? I don't know. I left Mr. Stevenson standing in the door and went to the grocery room. I got about half way and heard pistols fire and when I got back I saw Melton shoot Mr. Stevenson. When you got to the door did you see these other three men? Yes, sir. How far were they? Fifteen or twenty yards. How many shots were fired? Fifteen. (Here the witness showed the positions.) How near was Mr. Stevenson to the wagon. He was right at the wagon. When you saw the last shot fired, where did you see these three men? In the road. How far was Mr. Stevenson? Right there. Saw no other men but the prisoners and some women? They were behind Melton Belfield. When I went to the door he fired the last shot and was standing over him. You say Jim Stevenson was one of the

main ones; what did they all do then? They were hollowing
to Melton to come on, come. I ran to Mr. Stevenson and
found him dead. How long did he live? A few minutes,
died right there on the road. Did you find any of the bul-
lets? Yes, sir; I found one in the grocery room. Any hole
in the side of the house? Yes, sir; it went in the front back
through and hit box and fell in it. It was a 32. Where
was that hole in side of house? It went in diagonally. (Here
witness showed how it went in.) When you went out first
where was Melton Belfield? He was just a few steps off.
Where was he standing? Nearly in the direction of that
hole. Did you find any other bullets? Yes, sir; in the
store. It fell out of his clothes. Is that the bullet? Yes,
sir, 38. Did you bring those clothes here? Yes, sir.
(Clothes were here presented and examined and holes shown
to the jury.) Did you order these parties out? Yes, sir.
Did they go out? All but Melton. Did the other three come
back? Yes, sir; Melton remained in. What did he say?
Melton called Mr. Stevenson a damned son of a bitch. What
else did he call him? Damned scoundrel, poor white ras-
cal. What connection are they? Melton and John Belfield
are brothers; and June Bishop and Jim Stevenson are Mel-
ton's brothers-in-law."

Cross-examination by W. R. Johnson:

You stated they went in there to do some trading. Who
was the leader? Melton. When you ordered them out, did
these three prisoners go out? Yes, sir. They did not take
any part in the row, did they? Not specially. Didn't these
men go to Melton and ask him to come out? John did. It
appeared to you that they were trying to stop the trouble?
Did you find Mr. Stevenson's pistol? Yes, sir. Did he
shoot Melton Belfield? I do not know. Did you see pistol
in Mr. Stevenson's hands? No, sir. Did these three men
here appear to be peaceable? Not particularly; they were

quarreling.   John called back after Melton, didn't he?   Yes, sir.   These three men were not taking any part in the shooting affray, were they?   I don't know; I was in the grocery room.   How long were you gone in the back room?   I came back soon as I heard the pistols firing.   You ran did you? Yes, sir.   They were trying to get Melton away?   Yes, sir. They were not trying to hurt Mr. Stevenson?   No, sir. When Mr. Stevenson went out of the door, did you hear Mr. Stevenson say he was going to kill the damned black son of a bitch?   No, sir.   How far was Mr. Stevenson lying?   About fifteen steps.   There was nothing to indicate that he was pulled out there?   I do not think he would have ran out there.   He was after Melton Belfield?   Yes, sir.   Did you see any pistols in the hands of these fellows?   No, sir.   They were doing everything they could to get him away from there? Yes, sir; John hollowed to him to come out.   You do not pretend to say that Mr. Stevenson did not go out of the door? (Here the witness was asked by the Solicitor where the man was shot and the witness showed him.)   The bullets could have been shot in him after he fell, couldn't they?   I did not see but one shot.

By the solicitor—When you heard them crying, "Come on, come on," that was when you saw the last shot fired?   Yes, sir.

Evidence of J. L. Andrews, for State:   Where do you live?   In Roxobel.   Please state everything you heard or saw concerning this killing.   I heard a few reports of shooting.   Where were you.   In my house.   How far off?   Thirty-seven yards from Peele's store.   I thought they had been down to the celebration at Kelford, but it lasted so long I thought something was the matter.   How many shots were fired?   Fifteen or twenty.   What did you finally do?   I went to the door and saw Melton Belfield standing right over Mr. Stevenson and he shot him as I got to the door.   I stepped

to the door with the determination of going there and Belfield ran. Did you see any other persons? No, sir; no one but Belfield and Stevenson. You could see no other persons but those two? I could not think of anything else. Did you find anything about the place after he fell? Next day I picked up a ball just about the place Mr. Stevenson was lying. It was a 32. You know nothing about what happened inside the door? No, sir. You directed your attention just to those two? I couldn't think of anything else.

Cross examination:—Your store is thirty-seven yards from Peele's door? Yes, sir. You said when you came out you did not see anything but Melton Belfield bending over Mr. Stevenson shooting? Yes, sir. If these men (the prisoners) had been there, you could have seen them? The shooting was about over. I say, if these men had been engaged in it, you could have seen them? Yes.

By the solicitor:—What position was Stevenson in when you got there? Leaning on his left arm and commenced leaning over till he fell, and dying in a few seconds.

By attorney for defendant:—Can you swear there were as many as fifteen or twenty shots? Yes, sir; sounded like pop crackers.

Evidence of A. T. Liverman, for State:—Your name is Mr. A. T. Liverman? Yes, sir. Were you present in Roxobel on the evening of this shooting? Yes, sir. About 5 o'clock on the 9th April (I did not look at the clock) I went in same directon, about thirty yards, I heard several pistols. I looked and looked the road and saw several men who seemed to be engaged in a wrangling, and firing went on and I remained there when over four or five shots were fired; then three reports with slight lapse of time between the shots. After that I don't know what took place. I know there were several more pistols. I saw five men, four around one who seemed to be trying to get away. I saw four men who seemed

to be pressing around the men. One man was trying to get away. The four men were trying to stop him. Two men seemed to be behind the wagon. I saw him when he was falling. He appeared whiter than other four. I saw one man at his feet and one man at the fallen man and one there. Just as he was falling the pistols were firing repeatedly. I saw two men leave on right of the wagon and one on left of the wagon, and one seemed to remain a little longer. The last man that remained then ran off and somebody was hallowing, and I heard some one say, "Drive, drive." I was about 160 yards from where the firing began. I went about 120 yards from where Mr. Stevenson fell. You could not tell who the men were? No, sir. The shooting was so rapid I thought some stray bullet might come down this way, and kept aside. As soon as I stepped out I saw last man leave. Do you recall the last shot? No, sir; the men were standing over him, and the four men seemed to be bending over toward Mr. Stevenson. The wagon did not come towards you? No, sir; there were as many as fifteen or twenty shots. What other men besides the four men and the shot man? None at all.

Cross examination:—Could you not recognize any of the men? No, sir; there was so much smoke, etc. I could not tell who was doing the shooting. You don't pretend to swear that any of these men (the prisoners) fired shot? No, sir.

Evidence of Dr. A. Capehart:—Where do you live? Town of Roxobel, this county. The town is situated at cross-roads. It crosses the road coming from Hertford County at right angles. Do you know where the murder was committed? At the crotch of the road nearly in front of Peele's store. At what angle was Mr. Peele's store? They came from Kelford there in the left angle, this side. Did you see any part of what occurred? I did. Tell the jury. Where were you when you first saw anything of this occurrence? I was sit-

ting in my home and my attention was arrested by rapid
firing. I looked out of my window and saw a number of
men (it's about 125 yards to Peele's store). Four or five
men seemed to be engaged in what appeared to be gun shoot-
ing. Almost co-incidentally with the firing, my eye rested on
one of the party falling. I saw three or four men standing
around this man, and it appeared that he was being attacked.
I saw three flashes of pistols almost at the same time in differ-
ent positions and from different directions. These parties
who were around the man, nearly prostrate, were firing on
him. I knew there were more than one pistol being used,
because I could tell from the flashes. I saw three of them
scamper off. The fourth remained, and fired parting shot.
In the meantime the three that ran off were calling to this
man, saying, "Come on Melton; hurry, hurry." Some of
them got in the wagon and said, "Drive." There was a
wagon intervening between Peele Bros.' store. (Here the
witness referred to the diagram.) Did you see anyone in
the road but those four? I think not. Did you recognize
anyone at the time? I did not. Did you identify these
three men (the prisoners)? I did not. Go on and state
what you did? Some one came over and asked me to come
out. I went, and he was dying, lying on his back when I got
there. Describe all about it? He was taken from the road
and was carried to the store and was shrouded. Four balls
entered his body; one on the left side of his neck; one of the
balls had hit him in the back and was in the region of the
kidneys; the third ball hit about six inches to the left of the
spinal column between the eighth and ninth ribs, and ranged
internally; the fourth ball hit him in the shoulder, hit on
outer border of shoulder, did not hit blade, passed in diagon-
ally and entered the lung. The ball that hit him in the neck
went through lapel of the coat in the collar. What effect
would that have on him? All of them would have been nec-

essarily fatal, except possibly the one in the neck. From your examination, in your opinion, what position should they have been in? It would have been necessary for a man to be standing from the side to be hit in the neck; and the ball that hit him in the shoulder, the man must have been standing from the rear of the left side; one in the kidney was found almost vertically down; one between eighth and ninth ribs would have also been fired from the side; was shot from behind every time; none from the front. How many bullets in the clothes? Four in the coat and shirt, and this I think made seven. The one shot in lower part of his coat did not enter his body, was taken away. Did you see the ball found in the grocery room? Yes, sir; I found the ball that entered the grocery department from the right of the door. It must have been fired from the left. How far from main store from where you saw the man fall? Twelve or fifteen yards. How many shots, in your estimation, did you hear? Fifteen or twenty.

Cross-examination: Firing before I looked out of my window, and when I looked out I saw flashes; at least twelve or fifteen shots were fired.

Re-examination: Who was doing the shooting? I don't know. You did not identify them? I did not. Did you recognize the man that got up in the wagon? I did not.

Evidence B. F. Burket, for the State:

Do you live in Roxobel? Yes, sir. Where were you at the time of the shooting? I was in Mr. Tyler's store. How far? Two hundred yards. How was your attention directed to it? By shooting. I was behind store cutting wood. What did you see? I saw four or five men together. Could you tell who they were at time? No, sir; I could tell after they ran off. I saw last shot. Did you hear anything? I heard them hallowing, "Come on, come on, come on Melton." Who were they? Melton Belfield and the three pris-

oners, John Belfield, James Stevenson and June Bishop. Were they the ones you saw in the crowd around the deceased man? Yes, sir. Do you know how many shots you heard? I could not tell.

Cross-examination: How far were you from the scene of trouble? Two hundred yards from trouble to Mr. Tyler's store. Were you going at the time towards the shooting? No, sir. When you came out you stopped still? Yes, sir. They were 200 yards and you recognized them? Yes, sir. Do you mean to swear on your oath that you knew these men and could identify them on your oath? Yes, sir. Did you see either of these men firing pistols? No, sir. Could you not tell there were more than one doing the firing? Smoke was coming from more than one. Could you see the different puffs of smoke? Yes, sir. What was the position of the men? All together. Did you know who they were? No, sir. Did you see these men with pistols? No, sir. Were not these men trying to get Melton Belfield away from there? I don't know.

By the solicitor: You could not recognize the men in the mix-up? No, sir. You recognized the men as you stated? Yes, sir.

Evedince of Ellen Belfield, for the defendant:

Just tell what you saw? Well, I know Mr. Stevenson shot Melton Belfield twice. I am his mother. Where had you been that day? Kelford. I went in the store after pepper. Where had you been? Kelford; nobody with me but John. I went in Mr. Peele's store—me and John. I got my pepper. Mr. Stevenson handed it over the counter and Melton called him a son of a bitch again. Mr. Stevenson said I wasn't going to take that. Mr. Stevenson came out with his pistol. After I saw the blood running it frightened me. I saw the pistol in his hand when he came out of the store. I saw Melton and Mr. Stevenson shooting. Who fired the first

shot? Mr. Stevenson shot twice before Melton shot at all. Where did Melton get his pistol? I saw him get it from his hip pocket. He pulled it out and shot four times. Mr. Stevenson did not pass on by Melton? No, sir. Was John in the store? Yes, sir. At what time did he come out? All were out there when the shooting commenced. John came out before Melton. Did you see John with a pistol? No, sir. Hear him say anything about the firing? I did not see but two pistols.

Cross-examination: You, the mother of Melton and John? Yes, sir. Were any of these men drinking? I don't know. Where were you? I was in the store when Melton got after Mr. Stevenson about the meat and meal and cursed him, then Melton got out of the store and Mr. Stevenson came to the door and shot twice, and Melton shot four times. Facing? Yes, sir. After he was on the ground he shot three or four times. You remember about this matter when it was brought up before the magistrate's trial, and did you say when he made the shot you saw some man on your left? I don't know what happened after that. I left them all in a bunch. What do you mean? I heard two pistols—Mr. Stevenson's and Melton's. You say Mr. Stevenson shot twice and Melton four times, who was that you saw shooting when you testified before the magistrate when you turned your back? The reason I turned my back was because I was sick.

Evidence of Louisa Stevenson, for defendant:

Where had you been on day shooting took place? Kelford. Who went there with you? I went there on the wagon. Who was with you? Dora Savage, Melton and myself; June Bishop on cart. Stopped at Mr. Peele's to buy some sugar. Who went in there with you? Brother June and sister. June went in there to get some groceries Mr. Peele asked him to get. You were in the store all the time

it took place? I was in there before. He (Melton) came in there and asked Mr. Stevenson about some groceries and Mr. Stevenson told him he had given it to another, and he told Mr. Stevenson 'Mr. Peele told him to get thirty pounds of meat. Melton told Mr. Peele Mr. Stevenson cursed at him and that he had to trade at his store but if that was the way his clerk did he would not trade there any more. He told Mr. Stevenson he would not curse him any more. They did not run on any more before they were mad. He called Mr. Stevenson a poor son of a bitch. Mr. Stevenson told him he would not take that again, and he called Mr. Stevenson a God-damned black son of a bitch. Mr. Peele ordered him out, and Mr. Stevenson followed him and said, you damned narrow-faced son of a bitch. He had a pistol by his side, and came out and met Melton face to face. He shot him twice. Was Mr. Stevenson standing still? No, sir; they met and shot standing. When Mr. Stevenson shot him he was running. He put his hand in his pocket for his pistol, and shot him until he was down and done shooting. When he shot Mr. Stevenson, he shot and kept shooting. When Melton and Mr. Stevenson were shooting so the horses ran off and a little boy got them and Melton ran and got up. Where were these men (the prisoners)? They were not around this white man; were around the buggy and wagon. I did not see any of them shoot. Did any of these men say anything to Melton? Jim Stevenson told Melton, you done got the meat and meal, come on out; he would not come out and they left him alone.

Cross-examination: How many times did you see Melton and Mr. Stevenson shoot when they were facing one another? Mr. Stevenson shot twice and he shot Melton about the head. When Melton shot Mr. Stevenson, Mr. Stevenson jumped by and shot him when he was passing. Were they the only two men in the wrangle? Only two were shooting. You came

up before the magistrate? Yes, sir. You remember saying
in that trial that you saw June Bishop near Mr. Stevenson
with his hand in his hip pocket? Yes, sir. Did you hear June
Bishop tell Mr. Stephenson he could shoot as many times as
Mr. Stevenson could? Yes, sir. What else did you hear June
say? He told him (Melton) to use his things, that if he
don't, he would use his. You did not see June Bishop shoot?
No, sir. Did you testify in magistrate's trial that somebody
shot from behind you, and that June Bishop was behind you?
I told you the ball passed 'me. Which way was it? Passed
by me.

Evidence of Ella Bishop, for defendants:

Tell what you know. You are June Bishop's wife. Yes,
sir. Well go on and state what you know? Melton and Jim
Stevenson came on the wagon and asked Mr. Stevenson at
the door about some meat and meal. I didn't go in the
store. Did these three men (the defendants) come out before
Melton and Mr. Stevenson? They came out and heard Mel-
ton in there quarreling and went back in there to get him out.
Then June and John came out. When they were all in the
grocery room, Melton came up from the shoe shop and said
to Mr. Stevenson: "How much meat is that?" and he (Mr.
Stevenson) said "twenty-eight pounds," and that was what
brought on the row. Who came out first, these three men or
Melton? John and June came out before Melton. Did you
see Mr. Stevenson with the pistol? Yes, sir. How far was
Melton from him? Mr. Stevenson made three short for him
before he fired. When Mr. Stevenson shot he ran by Mel-
ton, and Melton shot him in the back. I did not see but
two pistols. These three men did not have any pistols.

Cross-examination: Melton had one pistol? Yes, sir.
What size shot? 32 or 38. How many times would Mel-
ton's pistol fire. Five times. Mr. Stevenson's pistol was
fired four times. Nine shots were fired in Roxobel. I am
June Bishop's wife.

Evidence of Isaac Jacob, for defendants:

Tell what you know about this shooting. Were you in it? No, sir. Did you go to Kelford? Yes, sir. Did you get out of the wagon when these men stopped at store? Who went in the store? I don't know. What was the first thing you saw? I saw a man (Mr. Stevenson) come out of the door and Melton went and met him, and Mr. Stevenson fired off at him twice, and Melton fired at him three times. That's all I saw. Did you see these other men? No, sir. Did Mr. Stevenson stand still when Melton was shooting? Yes, sir. When Melton shot him he went towards Melton and passed on by him.

Cross-examination: Mr. Stevenson shot first and twice? Yes, sir. Did you see the crowd around Mr. Stevenson? No, sir. I saw him when he passed Melton; was behind the wagon, and when Melton shot two times he whirled about. When they were face to face was it possible for Melton to shoot him in the back? He could not shoot him in the back.

Evidence of Sheriff T. C. Bond, for defendant:

State whether or not you saw wound in Melton Belfield's head when you brought him from Weldon? Yes, sir? I did not examine it. Did it look like it was recently inflicted? Yes, sir.

New trial.

Douglas, J., concurring. I concur in the conclusion of the court that there was no evidence of premeditation to go to the jury, and that, therefore, the prisoners should not have been convicted of murder in the first degree. There seems to be such a vital misapprehnsion of the evidence, on the part of some of us, that it seems eminently proper that the eidence should be published in full. If I took the same view of the evidence as some of my brethern, either of its substance or its lawful deductions, I would certainly vote for affirmance, as I have no scruples in hanging a man who is

guilty of premeditated murder.  But there must be some proof of such premeditation.  At common law the killing with a deadly weapon implied malice, and where such killing was admitted or proved beyond a reasonable doubt, the prisoner was presumed to be guilty of murder, and the burden rested upon him of showing such facts as he relied on in mitigation or excuse.  *State v. Byrd,* 121 N. C., 684, and cases therein cited.

There was then but one degree of murder, and that was a capital felony.  This was changed by Chapter 85 of the Public Laws of 1893, which divided the crime of murder into two degrees, the second degree being punishable only by imprisonment.  Since the passage of said Act, the presumption arising from the killing with a deadly weapon extends only to murder in the second degree; and the State is still required to prove beyond a reasonable doubt the facts necessary to bring the homicide within the statutory definition of murder in the first degree.  *State v. Booker,* 123 N. C., 713, and cases therein cited.

I am aware that this construction of the Act of 1893 was not unanimous at first, as shown in *State v. Fuller,* 114 N. C., 885, but it was settled before I came upon the bench, and needed not, though it has received, my cordial approval.  If it is correct, these prisoners could not have been found guilty of murder in the first degree in the absence of any proof of premeditation.  It should be remembered that Melton Belfield, who brought on the fight and admittedly shot the deceased, is not the one now on trial.  He has paid for his crime with the penalty of his life, having died of wounds received in his arrest for this killing.  The prisoner now before us is John Belfield, who, according to the testimony of Peele, the principal witness for the State, took hold of Melton's arm and tried to get him to leave the store, evidently in order to avoid any difficulty.  Acting the peace-maker is surely no evidence of premeditation.

It is always a matter of regret and concern to me that the question of life and death should depend upon my single vote, but I have no right to shirk the responsibilities of my postion, and must decide the question in strict accordance with my convictions of duty.

I concur in the opinion of the Court to the extent that there should be a new trial.

CLARK, J., dissenting.   There are no exceptions to evidence nor to the charge.   The only exceptions are to the refusal of the Judge to give the following prayers for instruction: 1. That upon the evidence the jury can not find a verdict of murder in the first degree.   2. That upon the evidence the jury can not find a verdict of murder in the second degree.   3. That upon the evidence the jury should render a verdict of not guilty.   It is, therefore, necessary to consider only the evidence against the prisoners, for if there was any evidence it was not error to refuse these prayers.

It was in evidence that the three prisoners and Melton Belfield (afterwards killed in resisting arrest) composed a party of two brothers and their two brothers-in-law who went to Peele's store in Roxobel on 9 April, 1902.   They were colored men and the deceased, Thomas Stevenson, was a young white man who was clerking in Peele's store.

A. T. Liverman testified that about 5 p. m., 9 April, 1902, he was at Roxobel; "heard several pistols, looked and saw several men who seemed to be engaged in wrangling and firing; firing went on and I remained there when over four or five shots were fired; then three reports with slight lapse of time between the shots.   After that I don't know what took place.   I know there were several more pistols, saw five men, four around one who seemed to be trying to get away.   I saw four men who seemed to be pressing around the man.   One man was trying to get away.   Two men seemed to be behind

the wagon. *The four were trying to stop him.* I saw him when he was falling. He appeared whiter than the other four. I saw one man at his feet and one man at the fallen man and one there. Just as he was falling the pistols were firing repeatedly. I saw two men leave on right of wagon and one on left of the wagon and one seemed to remain a little longer. The last man that remained then ran off and somebody was hallowing. I heard some one say, 'Drive, drive.' I was about 160 yards from where the firing began. I went about 120 yards from where Stevenson fell." He says he did not then recognize any of the men. He further testified that there were fifteen or twenty shots, and no one was at the place of the shooting besides the four men and the shot man, and that at the last shot the four men seemed to be bending over towards Stevenson, the deceased.

Dr. A. Capehart testified: "I was sitting in my home and my attention was arrested by rapid firing. I looked out of my window and saw a number of men (its about 125 yards to Peele's store). Four or five men seemed to be engaged in what appeared to be gun shooting. Almost coincidently with the firing my eye rested on one of the party falling. I saw three or four men standing around this man, and it appeared that he was being attacked. I saw three flashes of pistols almost at same time in different positions and from different directions. *These parties who were around the man nearly prostrate were firing on him.* I knew there was more than one pistol being used, because I could tell from the flashes. I saw three of them scamper off. The fourth remained and fired a parting shot. In the meantime the three that ran off were calling to this man 'Come on Melton; hurry, hurry.' Some of them got in a wagon and said, 'Drive.' " He said further that he did not recognize any of the men during the firing; that when it was over he went to deceased who was dying; that four balls had entered the body, three of which

would have proved fatal, and that seven bullets pierced the clothing; that all the balls entered from behind, *none in front;* that one ball in the neck must have been fired from the side and that the ball that hit the deceased in the shoulder must have been fired by a man standing in the rear of his left side; that the ball in the kidney ranged almost vertically down. He says deceased fell twelve or fifteen yards from the door of the store and that fifteen or twenty shots were fired. .

B. F. Burket testified that he saw the shooting; that he knew them when they ran off; that he saw the last shot; he heard them hallowing, "Come on Melton." He was asked "Who were they?" and replied "Melton Belfield and the three prisoners, John Belfield, James Stevenson and Junius Bishop." He says *they were the men he saw in the crowd around the deceased man.* On cross-examination he said the *puffs of smoke were coming from more than one pistol."*

Louisa Stevenson, a witness for the prisoners, in her testimony stated, that she saw the prisoner, June Bishop, standing near deceased with his hand on his hip pocket, and that he told Melton to "use his things and if he didn't he would use his." And that Bishop was behind her when a shot came from that direction.

June Bishop's wife, witness for prisoners, in her testimony said that Melton's pistol would fire five times.

C. T. Peele testified among other things that Melton Belfield and the other prisoners *came together to the store* that day, that Melton began quarreling and he ordered him out, that Melton called the deceased a damned son of a bitch, a damned scoundrel, a poor white rascal; that the deceased reached up and got his pistol; that he went to the rear of the building, and when he got back the deceased was out some fifteen or twenty yards in front of the store, that Melton Belfield and the prisoners were the only persons out there except

some women; that some fifteen shots were fired and that as
he went to the door the last shot was fired, which was by Mel-
ton Belfield; that he did not see any pistol in the hands of
deceased; that there were seven bullet holes in his clothes
(which were shown to the jury), that when he ordered them
out of the store Melton remained in and the other three went
out but came back into the store. On cross-examination he
was asked: "There was nothing to indicate that he (deceased)
was pulled out there?"    To which he replied: "I do not think
he would have run out there."

J. A. Andrews testified that fifteen or twenty shots were
fired, that just as he got to the door Melton Belfield was
standing right over deceased and shot him just then and ran
off, that the shooting was over and he saw there then only
those two men.

There was some additional evidence for the State and some
evidence for the defence, but it is not our province to weigh
the testimony. That belongs to the jury. The only question
before us is whether there was any evidence for the State of
murder in the first degree.

If the above evidence is to be believed, four colored men,
brothers and brothers-in-law, went in a body to the store where
a young white man was clerking. One of them (Melton)
commenced quarreling and Melton called the clerk most in-
sulting names, when the clerk reached for his pistol and the
negroes were ordered out by Peele. Melton refused to go;
the other three went out but came back. Soon thereafter,
according to the testimony of several witnesses, all four were
chasing the deceased *and trying to prevent his escape,* firing
at him as he ran, and that fifteen or twenty shots were fired.
The evidence of the physician is that the deceased was struck
by seven shots, all from the rear, and three of them fatal;
that after he fell Melton Belfield stood over him and fired a
last shot; that the others called on him to come, to hurry up,
and all four jumped in a wagon and drove hurriedly off.

Upon this evidence the killing was an assassination, without provocation, in front of his store of an unoffending young man who was entitled to the security of life and person at the hands of the law. It was (if the evidence is believed) a joint killing by four men all participating therein. The deceased was trying to escape and four men were surrounding him to prevent it, firing at him as he ran, some fifteen or twenty shots being fired, which was more than one or even three pistols could have fired, and all seven of the bullets which struck him coming from the rear.

It is not law that when one is killed, several being engaged in the joint or common assault, that only he is guilty who can be shown to have fired the fatal shot. If such were the case, it would be a perfectly safe pastime for two men or more to chase down and shoot a fellow mortal, for no one, not even the shooters, could say who did the slaying. On the contrary, the law has ever been that if one is guilty of murder in the first degree, all who are present, aiding, abetting or encouraging the perpetration of the crime are guilty of the same degree of murder as he who fired the shot.

As far bask as *Reg. v. Wallis,* 1 Salk, 334 (1703), it was held that if several made a riot and a man is killed, all are principals in the murder, Holt, C. J., saying: "Who actually did the murder is not material; the matter is that a murder was committed, and the other is but a circumstance, and all are principals." In a late English case, *Queen v. Salmon,* 6 L. R. 79 (Q. B. Div. 1880), where three were recklessly firing at a target with long range rifles and a boy was unintentionally killed, but it could not be shown by which, all three were held guilty of manslaughter (the degree of crime upon those facts).

Even if any one of the prisoners did not fire a fatal shot or any shot at all, if he were there acting in support of those who were chasing the deceased and shooting at him, or en-

couraging or aiding those who did the shooting, he was guilty as those who fired the three fatal shots. Wharton Cr. Law, Sec. 211; *State v. Walker,* 98 Mo., 95; 1 Bishop Cr. Law (6th Ed.), Sec. 636. It is not necessary to show that these four men went there with a preconcerted plan to act together. That they did act together and united in a common effort to kill the deceased makes all guilty of the same degree of crime.

Four witnesses testify that fifteen or twenty shots were fired, which is as much as three to four five-shooters would have fired, if all their barrels were emptied. All these witnesses testify that the four men were engaged in chasing the deceased, trying to head him off. These four men were identified as the prisoners and Melton Belfield. No provocation was shown to have been given to the three prisoners by the deceased, and, as to Melton, it was Melton who gave the provocation. It ought to take no citation of authority to establish that all four are responsible, irrespective of which ones fired the three fatal shots, and that in such a chase, four men after one, and time elapsing enough to fire fifteen or twenty shots, there was evidence of premeditation, far more than was in *Dowden's* case, or in any of the other cases cited below.

If this is not murder, in what way could these four negroes have committed murder in the first degree unless they had lain-in-wait for their victim? Is it any less murder because, instead of ambush, they resorted to numbers and in more reckless defiance of law they chased and *headed him off* and shot him to death with fifteen or twenty pistol shots in open daylight in front of his store?

One solitary case is cited as authority that four men being in pursuit of deceased, no one can be convicted unless it can be shown who fired the three fatal shots. That case is *Campbell v. State,* 16 Ill., 17; 61 Am. Dec. 49, but an examination shows that the charge there approved was: "If it is uncertain from the evidence, in the minds of the jury, which one out

of two or more persons inflicted the stab that would operate to acquit the prisoner, *unless there is proof that the prisoner aided or abetted* the person ascertained to have killed him." This qualification puts the case in line with the uniform ruling of all courts. When two or more unite in an act which results in death all are guilty, though only one gave the fatal stab, blow or shot. 1 Wharton Cr. Law, Sec. 396, and cases cited; also *Dumas v. State,* 62 Ga., 58; 1 Bishop Cr. Law, Sec. 629 (2) and cases cited; Wharton Cr. and Pl., Sec. 301, and cases cited; *State v. Johnson,* 7 Oregon, 210; *Brennan v. People,* 15 Ill., 511; *Ruloff v. People,* 45 N.Y., 213; 2 Greenleaf Ev., Secs. 40, 41; but it can not be necessary to add more cases, for the doctrine is based upon reason and is universally recognized. When several combine in an unlawful act, as here in chasing the deceased and firing at him, all who are present, aiding and abetting are equally guilty, whether all fired at him or not. This is fully and ably discussed in *Spies v. People,* 122 Ill., 1, 3 Am. St. Rep. 320 and notes. This was the celebrated Anarchist case. In *People v. Mather,* 4 Wend., 230, 21 Am. Dec., 122, it was well said by Marcy, J. (later the celebrated Secretary of State of the United States): "The fact of conspiring need not be proved; if parties concur in doing the act, although they were not previously acquainted with each other, it is a conspiracy." Here, if the only fatal shot had been fired by Melton, these prisoners, if five witnesses have sworn the truth (and of that the jury are the judge), were all present actively aiding by "trying to head the deceased off," and three of them present, if not all four, emptying their five barreled pistols at him, as the testimony concurs that 15 to 20 shots were fired. Dr. Capehart testified that he saw *three pistols flash at once.* *State v. Straw,* 33 Me., 554; *Doan v. State,* 26 Ind., 495; *Washington v. State,* 36 Ga., 222; *Rex v. Perkins,* 4 Carr and Payne, 537.

In *State v. Gooch,* 94 N. C., at p. 1014, the Court cites and approves the following: "In *Rex v. Cox,* 4 C. & P., 538,

the rule is thus laid down: 'If two persons are engaged in pursuit of an unlawful object, the two having the same object in view, and, in pursuit of that common object, one of them does an act which is the cause of death, in such circumstances that it amounts to murder in him, it amounts to murder in the other also.' To the same purport, *State v. Whitt,* 113 N. C., at pp. 718-720, which very much resembles this case. In *State v. Gooch,* 94 N. C., at p. 1013, the Court cites with approval "Lord Hale's Pleas of the Crown, Vol. 1, p. 440, which thus lays down the doctrine on the subject: 'If divers persons concur in an intent to do mischief, as to kill rob or beat another, and one did it, they are all principals, and if many be present and only one gives the stroke whereof the party dies, they are all principals if they came for that purpose.' "

But it is contended that there is no evidence of a deliberate and premeditated killing. The statute does not restrict murder in the first degree to cases in which the slaying has been done by lying-in-wait, or poisoning, or has been planned beforehand. The premeditation or deliberation may take place after the parties meet, and this may be deduced from the attendant circumstances, the absence of provocation, the numbers brought against the deceased, the pursuit by four men following up one who is fleeing and trying in vain to escape, the standing over him after he is down fatally wounded, the firing the last shot into the prostrate body, the other three with smoking pistol barrels standing by, and then their calling to him to come on, hurry up, let us drive, and going off together.

In *State v. Foster,* 130 N. C., at p. 671, the last case before this Court, it is said: "It has been *uniformly* held by this Court that if the purpose to kill was formed before the killing took place *'no matter for how short a time,'* it would be within the power of the jury to find him guilty of murder in the first

degree, and not violate the law, nor their oaths as jurors." It should not be necessary to cite cases, for, as the Court said, our authorities are uniform to that effect, but among them we may quote:

In *State v. Dowden,* 118 N. C. (quoted in *State v. Foster, supra*) at p. 1153, it is said: "This Court has not followed the intimations of some of the Courts of other States that in order to constitute deliberation there must be evidence of a definite design formed on some occasion previous to the meeting at which the killing was done, and cherished up to and at the time of putting it into execution. * * * The question of the time that elapses between the determination to kill and the killing being immaterial."

In *State v. Gadbury,* 117 N. C., 811, where there was no lapse of time, but one shot fired and that without warning, Furches, J., held that whether this was murder in the first degree or the second degree was a question for the jury.    The same Judge (Brown) followed that ruling in this case.

In *State v. Dowden, supra,* the shooting was done, not with a multitude as here, but by one man, and "in ten or fifteen seconds" after the deceased told the prisoner to get off the engine, and this Court unanimously sustained a verdict of murder in the first degree, Avery, J., saying: "If the prisoner weighed the purpose of killing *long enough to form a fixed design* to kill, and at a subsequent time, *no matter how soon or how remote,* put it into execution, there was sufficient *premeditation and deliberation* to warrant the jury in finding him guilty of murder in the first degree.    *State v. Thomas,* at this term; *State v. Norwood,* 115 N. C., 790; 44 Am. St. Rep., 498; *State v. Covington,* 117 N. C., 834; *State v. McCormac,* 116 N. C., 1033."

In *State v. McCormac,* 116 N. C., 1036, the Court says, quoting Kerr on Homicide, Sec. 72: "The question whether there has been deliberation is not ordinarily capable of actual

proof but must be *determined by the jury* from the circumstances. It has been said that an act is *done with deliberation however long or short a time intervenes after the intent is formed* and before it is executed, if. the offender has an opportunity to recollect the offense." The Court then goes on to say: "In arriving at a conclusion, they (the jury) would naturally look to the testimony as to the *conduct of the prisoner at and about the time of the homicide* and the attendant circumstances to throw light upon the question, *rather than to a computation. of the time intervening between the formation and execution of the design."* Is not that the law in this case; if not, why not?

In *State v. Covington,* 117 N. C., 834: The only evidence of the circumstances under which the homicide was committed, was the prisoner's alleged conversation that he entered a store to commit larceny, the deceased got between him and the door, that 'I watched my chance and jumped on the old man and wrenched his pistol and the old man hallowed 'murder;' then I shot him through the body. The old man said, 'You have got me.' I aimed to shoot him and this must have been when I shot him in the neck, and I shot him again." The Court held that it was proper to instruct the jury that "In no view of the evidence was the defendant guilty of murder in the second degree or manslaughter, but the jury should *find the prisoner guilty* of murder in the *first degree* if they believed that evidence, or acquit if they did not." Why then is it not at least evidence of murder in the first degree that all four in this case were engaged in *trying to head off* a fleeing man, and at least three and doubtless all four were *aiming* to shoot him (as four witnesses testify there were fifteen to twenty shots) and aiming so well that seven bullets struck him, three of them fatal and all in the rear, and when not a single witness testifies as to any legal provocation, and as to absolutely no provocation at all by deceased toward these

three prisoners. This case has been repeatedly cited as authority since and has never been questioned.

In *State v. Thomas,* 118 N. C., 1120, citing *State v. Covington,* it is said that the expression of the prisoner, "I aimed" to kill him, justified a verdict of murder in the first degree, because (on the facts on that case) it tended to show that the prisoner formed the design to kill, "not in the heat of passion aroused by combat, but when the deceased acknowledged he was vanquished." Here, there was no combat shown by deceased as to these prisoners, and if it were shown that there was an altercation with Melton, the deceased acknowledged himself vanquished by fleeing, and was pursued by superior numbers, fifteen or twenty shots fired, shot every time in the rear, and again after he was down, and all four participating in the last bloody and savage act.

In *State v. Norwood,* 115 N. C., 793, 44 Am. St. Rep., 498, it is said that if the prisoner "deliberately determined to take the child's life by putting pins in its mouth it is immaterial how soon after resolving to do so she carried her purpose into execution," and there are several other cases all to the same effect. It is useless to add to those citations, for in *State v. Foster,* 130 N. C., at p. 671, the Court reiterated that "It has been *uniformly* held by this Court that if the purpose to kill was formed before the killing took place, *no matter for how short a time,*" it would be murder in the first degree, and also at last term the unanimous Court in *State v Conley,* 130 N. C., at p. 686, approved the following charge of Judge Coble: "By premeditation is meant thought before hand, *for any length of time however short.*"

The law is thus clearly and admirably stated by Dr. Wharton, 1 Wharton C. L. (9th Ed.), Sec. 380, with a long list of authorities to support his text: "To establish the predicate of 'premeditated' which under most of the statutes is an essential incident of murder in the first degree, it has been said

that a positive previous intent to take life must be shown, but this opinion has since been recalled by the Court that delivered it, and is *opposed to the weight of authority everywhere,* And it has also been said that where the fact of death alone is proved, the presumption is that it is murder in the second degree, it being incumbent on the prosecution to rebut this by something, however slight, from which premeditation can be inferred. But be this as it may—and when analyzed the position varies very little from that of the Crown writers on murder, who draw the presumption of malice aforethought, not from the fact of death, but from the nature of the wound, instrument, etc.—there is a substantial concurrence of authority on the general meaning of *premeditation.* It involves a prior intention to do the act in question. It is not necessary, however, that this intention should have been conceived for any particular period of time. It is as much *premeditation* if it entered into the mind of the guilty agent *a moment before the act* as if entered ten years before. And the reason of this is obvious. (Here follow the reasons.) Hence, Judges have generally united in holding that while there must be some sort of premeditation, *i. e.,* the blow must not be the incident of mania or the sudden paroxysm of passion, such as suspends the intellectual powers—whether there has been such *premeditation is for the jury.* * * * The question, in other words, is one of fact, not of arbitrary technical law." His Honor, therefore, properly left it to the jury in this case. The above is buttressed upon cases so numerous and from so many States, that citation of them is omitted here, as they can be found by turning to the section (380) above quoted.

Again, in the same work, at section 117, it is said, citing very numerous authorities which can there be found, without repeating them here: "It is constantly laid down, that intent at the time of action is enough. It is not meant to assert by this that a person who, under sudden impulse, kills another,

is guilty of murder. To say this would be unwarranted, for the reason that we have no means of saying that a particular implse is sudden. What we have a right, however to say, and what the law means by this maxim to say, is this, that when a homicide is committed by weapons indicating design, then it is not necessary to prove that such design existed at any definite period before the fatal blow. From the very fact of a blow being struck, we have a right to infer (as a presumption of fact, but not of law) that the blow was intended prior to the striking, although it may be at a period of time inappreciably distant." The authorities cited are very numerous and uniform, and sustain the text, and show that our decisions conform to those elsewhere. It may, perhaps, be thus succinctly stated: At common law and up to the statute dividing murder into two degrees, killing with a deadly weapon being shown, malice and premeditation were presumptions of law. Now, a killing being shown, murder in the second degree is a presumption of law, and if further, the killing with a deadly weapon is shown, indicating design, then, whether there was premeditation is a question of fact for the jury, and they have a right to infer premeditation from the nature of the weapon, or other attendant circumstances. In such cases, that question is always one to be submitted to the jury, and it was not error to submit it to them on the facts of this case.

When (if the evidence is believed) these four men pulled out their pistols and commenced firing upon one man, and continued to pursue and fire upon him while fleeing, that was evidence of a deliberately formed intent to kill, and that intent necessarily preceded the actual killing. It also showed concert of action. The evidence that all the shots came from the rear, and that when the deceased was down, fatally wounded, a shot was fired by one of the number, the others standing by encouraging him and calling to him to escape with them, is evidence confirmatory of a previously formed intent to kill.

STATE *v.* BISHOP.

When it is shown that the parties did combine and act together in the execution of an unlawful purpose, a previous agreement to do so need not be shown, *People v. Mather,* 4 Wend., 230; 21 Am. Dec., 122; but there is evidence of the latter which the jury were well warranted in considering. Four colored men, nearly related, go together to a store; they all go armed, for the evidence is that in a few minutes all of them were using pistols; one of them grossly insults a white man without provocation, and when ordered out refuses to go, but reiterates the grossest insults, calculated to bring on a fight, while his three companions, who had gone out, return into the store; soon after the white man is seen out of doors running for his life, with all four chasing him and four revolvers barking on his track, seven shots strike him, all from the rear, he is shot again after he is down, then all four jump into a wagon and drive off. No witness, not even those for the defence, states that there were any words or any movements by the deceased against these three prisoners, yet there is evidence that they pursued him and aided in compassing his death. Is not this unprovoked participation in the tragic death of the deceased some evidence of that premeditated, deliberate killing which constitutes murder in the first degree?

"What *all* the evidence shows" is solely for the jury, not for the Court; and the jury have decided that it proves beyond a reasonable doubt that the prisoners are guilty of murder in the first degree—beyond any reasonable doubt in the minds of any one of the twelve impartial men who heard the evidence, and whose province it was to pass upon the facts. This Court can not sit as a revising jury to pass upon their action. If it be conceded (which I do not claim) that we are wiser and more impartial than the jury who found the verdict, we are at the double disadvantage of not having heard the witnesses nor been present at the trial, and that the law

does not give us power to weigh the evidence.    Smith, C. J.,
in *State v. Hardee,* 83 N. C., at page 622, says: "Nor will
the Court look into the evidence to ascertain if the verdict was
rendered upon testimony which ought not to have convicted"
—citing *State v. Storkey,* 63 N. C., 7, and *State v. Davis,* 80
N. C., 384.

There are only two accounts given of the slaying of the de-
ceased.    That of the State's witnesses above recited, which,
if believed, is strong, and it should seem conclusive, evidence
of murder in the first degree.    The other version is that of
the four witnesses for the defence, three of whom are women
and near relatives of the prisoners.    Their account is that
there was a fight between deceased and Melton, and deceased
fired two shots and Melton three, and no one else fired or had
any part in the difficulty, and if this is true the prisoners are
guilty of nothing.    Aside from the relationship and the fact
every one knows the women left when the shooting began,
there is the fact that deceased's clothes showed seven bullet
holes, all in the rear, and no one else is shown to have been
struck.    What was the truth of the transaction was for the
jury, to whom his Honor left the determination of the facts
under a charge not excepted to, and it is not for this Court to
reverse their finding of the facts.

In *State v. Smith,* 126 N. C., 1116, it was held by a unani-
mous Court, through Montgomery, J., that "Where there is
evidence, more than a scintilla, on the part of the State, going
to show premeditation and deliberation on the part of the
prisoner, indicted for murder, it is for the jury to pass upon
the guilt of the prisoner, and the degree, if guilty."

And further, "The credibility of the witnesses and the
weight of the evidence are for the jury, and not for the appel-
late court, although it may differ from the jury as to the
weight of the evidence, where it is conflicting."

The presiding Judge could have set aside the verdict, and

would have done so in this case, in the discharge of his duty, if he had thought the evidence did not justify the verdict. That power is wisely vested in him who heard the evidence and saw the bearing of the witnesses on the stand. The only authority committed to us is to pass upon the assignment of errors of law, which, in this case, is the allegation that there was *no evidence.* In such case, we can only consider the evidence against the appellants, and if there is any evidence, more than a mere scintilla, it is for the jury, and the jury alone, to say whether the evidence is overcome by the evidence for the defence. That is their province, not ours. Three out of the four witnesses for the defence in this case, as already stated, are women nearly connected with the prisoners, and what weight that fact should have, in considering the credit to be given their testimony, was for the jury to decide. *State v. Lee,* 121 N. C., 544. The jury also knew, as we can not know, the character of the witnesses, and the credit which should be given to the testimony of each. For wise purposes, trial by jury was established by our ancestors, and has been continued and declared inviolable by our present Constitution. Any impairment of their powers or curtailment of them by the appellate Court revising the judgment of the jury upon the weight of the evidence, is contrary to the organic law and our unbroken line of decisions. If the Court can pass that line for the prisoners in a State case, there is nothing to hinder like action in any other. To judges of fact, grounds of challenge are always allowed. To judges of law, there are none. Therefore, they should be all the more careful not to infringe upon the province of those to whom the Constitution and the laws have committed the ascertainment of the facts.

The prisoners have had a fair trial before a learned and impartial Judge, with two able counsel to defend them. It speaks well for the forbearance of the law abiding people of Bertie that this is so. I have been unable to discover any error or any wrong done the prisoners in this trial.

MONTGOMERY, J., dissenting.  At the time of his death, Stevenson was a salesman in the employment of Peele, a witness in the case.  The three prisoners, together with Melton Belfield (now dead), on the day of the homicide, went to the store of Peele for a lawful purpose, so far as the evidence discloses.  Before the shooting commenced, the prisoners were peacemakers.  On his cross-examination, Peele said, in answer to the question, "They did not take any part in the row, did they?" "Not specially." "When you ordered them out, did these prisoners go out?" "Yes, sir." Peele further testified that upon hearing pistol firing, he returned from the back room of the store to the front door; he then saw Melton Belfield shoot Stevenson; that he fired standing right over him, and that he saw no pistols in the hands of prisoners. But the evidence of Liverman and that of Dr. Capehart went to prove that the prisoners were engaged in the shooting, and under circumstances tending to show premeditation on their part to kill Stevenson; and upon that evidence, doubtless, the jury convicted them of murder in the first degree.  A very short time elapsed between the moment when the prisoners were peacemakers and the time when they did the shooting, according to the evidence of the two last-named witnesses, it is true; but premeditation is not a question of time.  If the intent to kill springs from a sudden gust of passion, and the act of killing is simultaneous with the formation of the intention, then there is no premeditation.  But if the purpose to kill has been considered long enough to fix in the mind the determination to do the act, and then subsequently, either remotely or immediately, the killing is done, premeditation exists.  *State v. Dowden,* 118 N. C., 1145; *State v. Foster,* 130 N. C., 666.  I think there was no error.